**F.C. IMPORTS, INC.; Fernando Couso and Esperanza Diaz; and the Conjugal Partnership Composed by Fernando Couso and Esperanza Diaz, Plaintiffs,**

v.

**The FIRST NATIONAL BANK OF BOSTON, N.A., Defendant.**

**Civ. No. 91–2485 (JP).**

United States District Court, D. Puerto Rico.

March 2, 1993.

---

Héctor F. Martinez Jiménez, Santurce, P.R., for plaintiffs.

Manuel A. Moreda Toledo, Paul R. Cortés Rexach, Sweeting, González, Cestero & Bruno, San Juan, P.R., for defendant.

## OPINION AND ORDER

PIERAS, District Judge.

The Court has before it defendant's unopposed[1] motion for summary judgment filed on December 18, 1992. For the reasons stated below, the defendant's Motion is hereby GRANTED.

### I. Background

F.C. Imports, Inc. ("Imports"), Mr. Fernando Couso ("Mr. Couso"), Mrs. Esperanza Diaz and their conjugal partnership,[2] filed the instant action on November 26, 1991, against The First National Bank of Boston, N.A. ("FNBB"). Imports was a wholesale supplier of electronic appliances and creditor of Novedades Guerra, Inc. ("Novedades"), a retail seller of electronic appliances. On June 10, 1992, plaintiffs filed their final amended complaint (hereinafter "the complaint").

Plaintiffs seek to hold FNBB liable for the debts owed by Novedades to Imports for electronic appliances Imports sold on credit to Novedades. Plaintiffs aver that Imports accepted five post-dated checks drawn against a Novedades corporate account with FNBB relying on FNBB's assurances that Novedades would have sufficient funds in its account to cover the amount of the checks.[3] Plaintiffs allege that after Imports accepted the checks FNBB undertook a series of fraudulent or negligent actions which caused Novedades debt to Imports to remain unsatisfied. The alleged amount of the debt owed by Novedades to Imports for unpaid appliances is $93,265.46.[4] Imports also seeks to recover from FNBB $3,000,000.00 for its alleged loss of profits from future sales to Novedades and for damages to its goodwill. Mr. Couso, Mrs. Couso, and their conjugal partnership seek to recover $1,000,000.00 for alleged damages suffered as a result of FNBB's actions.

Plaintiffs allegations can be summarized as follows. FNBB knew and approved of Novedades' practice of paying its suppliers with post-dated checks and induced Imports to

---

1. Pursuant to Rule 311.5 of the Puerto Rico Local Rules plaintiffs had ten (10) days to oppose defendant's motion. The time for plaintiffs to file an opposition to the motion or to request an extension of time to oppose the motion expired on January 7, 1993. On January 11, 1993, plaintiffs filed a Motion Requesting Extension of Time (docket No. 84) in which they asked the Court to grant them an extension of ten (10) days to oppose defendant's motion. Plaintiffs have failed to show good cause for their late request for the extension, or for their failure to act within the specified time period. Plaintiff's request for an extension was not acted upon by the Court; however, had it been granted, plaintiffs would have been granted leave to respond only until January 25, 1993. This date has also passed without a filing of a response by plaintiff. The Court therefore deems defendant's motion to be unopposed.

2. Mr. and Mrs. Couso were Import's owners; Mr. Couso was Import's president.

3. The relevant sales to Novedades were made during the months of October and November 1990. In exchange for the merchandise it sold to Novedades, Imports received five post-dated

checks the first of which was dated April 22, 1991, and the last of which was dated May 27, 1992. When Imports presented the checks to the bank for payment all five checks were dishonored by the bank because Novedades' account contained insufficient funds to cover the amounts of the checks. Subsequent collecting efforts made by Imports failed. Novedades filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code, 11 U.S.Code, sections 101–1330.

4. The complaint does not explain the discrepancy between this $93,265.46 figure and the $14,000 figure represented by the four checks listed in the complaint. It is not clear whether Imports extended credit to Novedades in any way other than by accepting Novedades post-dated checks. Furthermore, the complaint does not explain what role, if any, FNBB played in any credit transactions which might have transpired between Novedades and Imports, but which did not involve the issuance by Novedades of post-dated checks.

accept Novedades' post-dated checks by falsely representing that Novedades' account held sufficient funds to cover the amounts of the checks and by representing that the proceeds Novedades acquired from the sales of merchandise provided on credit would be used to pay Novedades' creditors. Instead of honoring its representations, FNBB, itself a creditor of Novedades, funneled out from Novedades' account the sales proceeds from merchandise sold on credit to satisfy debts Novedades owed to FNBB. Plaintiffs aver that FNBB depleted Novedades' accounts by making numerous offsets against Novedades' commercial line of credit; by applying amounts deposited in Novedades' account toward the reduction of the debt owed by Novedades to the bank under the line of credit; by substituting checks drawn against Novedades' account with manager's or certified checks and thereby benefiting certain creditors of Novedades to the detriment of Imports; by using funds deposited in the account to extend credit advances in favor of some creditors of Novedades thereby benefiting these creditors to the detriment of Imports; and by honoring some checks drawn against Novedades' corporate account while dishonoring checks presented by Imports. Furthermore, Imports alleges that FNBB further depleted Novedades' funds by requesting additional security from Novedades' shareholders and officials and opening an additional account to deposit Novedades' sale proceeds and pay some of Novedades' debts while other debts of Novedades went unsatisfied because of the lack of funds in Novedades' regular account. Plaintiffs allege that FNBB allowed Novedades resale profits to be "ripped away" from Imports by letting Novedades issue checks for the purchase of additional inventory goods.

Plaintiffs allege that FNBB acted maliciously and with specific intent to prejudice and defraud third party creditors of Novedades, or at the very least was negligent in managing Novedades' affairs to the detriment of Novedades' creditors. Plaintiffs' complaint lists the following causes of action: compensatory damages for breach of contractual obligations; compensatory damages for fraud, misrepresentations and negligence; compensatory damages for breach of fiduciary duties; compensatory damages for unsafe and unsound banking practices; and damages for tortious interference with the contractual relationships.

In support of its motion for summary judgment, FNBB has submitted the deposition testimony of Mr. Couso, interrogatory answers provided by plaintiffs, the sworn statement of FNBB's commercial finance manager, Mr. Rufino Rosado, and a statement of material facts. FNBB argues that these materials show that it is entitled to judgment as a matter of law.

The following facts are undisputed. On March 12, 1990, FNBB approved an $800,-000.00 secured revolving line of credit on behalf of Novedades. On April 1990, Novedades and FNBB executed an agreement under which Novedades could request loans up to this credit limit from FNBB to use for its working capital needs. As collateral for the payment of the loans, Novedades executed and gave FNBB a factor's lien[5] over all its present and future inventory and assigned to FNBB all its present and future accounts receivable. FNBB and Novedades further agreed that FNBB would not be obligated to loan Novedades money under the line of credit, rather it would loan money only at its discretion. The parties agreed to use a special borrowing base[6] to determine the maximum ceiling of the loans to be disbursed to FNBB at any one time. If at any time the debit balance of the loan account exceeded the maximum amount borrowable under the borrowing base formula, Novedades agreed to deliver whatever cash payments were nec-

---

**5.** A factor's lien is the right of a factor (the bank in this case) to keep possession of his principal's (Novedades in this case) merchandise until the latter has settled his account with it. Black's Law Dictionary, 5th Ed.1979.

**6.** Originally the borrowing base was defined as an amount equal to the lesser of (a) $800,000.00 or (b) the sum of (i) sixty percent of the net security value of base inventory, (ii) seventy percent of the net outstanding amount of the base accounts. It was agreed by FNBB and Novedades that the borrowing base would be computed according to the outstanding amount of loans under the line of credit.

essary to eliminate the deficit or to give FNBB additional collateral.[7]

Pursuant to the credit agreement Novedades opened two accounts with FNBB—a corporate checking account and a depository account. The corporate checking account (account no. 1004959) was exclusively funded by loans disbursed by the bank under the line of credit; Novedades never deposited funds of its own in this account. The depository account (number no. 1004967) was used by Novedades to deposit the proceeds from the sale of its inventory, which collateralized the loans disbursed by FNBB to Novedades under the line of credit; this type of account is known as a factor's lien account. No checks were issued by Novedades against the depository account. Pursuant to the credit agreement, monies deposited in the depositary account would be applied, at least once a week, to the amortization of the outstanding loans. Interest generated by the loans was collected from credit-line funds deposited in the corporate account until February 1991, at which time interest began to accrue on the funds in the depository account.

To obtain disbursements of loans under the line of credit, Novedades was required to submit a "Borrowing Base Report" at least once a week. This report would show the outstanding balance of loans disbursed under the line of credit, the value of Novedades' inventory, and the available margin of disbursements. Loans would be disbursed into Novedades' corporate checking account only as long as there was an available margin. Whether there was an available margin depended on the outstanding balance of loans and the current value of Novedades' inventory.[8]

Novedades started experiencing economic difficulties at the end of 1990. As a result of poor sales during the 1990 holiday season, Novedades available cash flow diminished dramatically during the final months of 1990 and the first few months of 1991. By October 18, 1990, Novedades' corporate account was overdrawn in excess of $100,000.00 and the funds in Novedades' corporate checking account were insufficient to cover all the checks drawn by Novedades. Thus, if on any given day the checks presented exceeded the available credit margin, FNBB would dishonor the checks or pay them in whatever order was most convenient to FNBB. On December 3, 1990, FNBB granted Novedades a $350,000.00 increase in the line of credit so that Novedades could cover its working expenses and reimburse the bank for the payment of overdrafts. Additional collateral was requested and obtained.[9] Starting in January 1991, the bank refused to honor checks presented for payment against Novedades checking account if paying the checks would exceed Novedades' new credit limit of $1.3 million. In early March 1991, FNBB discovered that Novedades had been misrepresenting the value of its inventory. A physical inventory revealed that instead of having an inventory valued at $2,077,000.00, as represented by Novedades in its March report, the inventory was worth only $816,000.00. Because the borrowing base used by FNBB to determine the amount of loans that would be disbursed into Novedades' checking account was based in part on the value of Novedades' inventory, the fact that the inventory was significantly less valuable signified that FNBB had made a gross over-advance of loans—in the amount of $818,000.00—to Novedades. Moreover, approximately $500,000.00 in loans were now unsecured due to the absence of sufficient collateral. FNBB requested additional collateral from Novedades and asked Novedades to decrease the over-advance made by paying the bank $10,000 weekly. FNBB also began monitoring Novedades' inventory on a daily basis. The bank continued loaning money to Novedades

---

7. Notices of Establishment of Factor's lien, a statement of Assignment of Accounts Receivable, and a promissory note, with a face value of $800,000.00 were duly executed and properly recorded by the parties.

8. On June 8, 1990, FNBB approved a temporary 90–day increase of the credit line from $800,000.00 to $950,000.00.

9. Second mortgages were constituted over the residences of Novedades' principals, Mr. and Mrs. Couso and their son. In addition, an unlimited personal guaranty was obtained from Mr. and Mrs. Couso.

only if new loans disbursed would not increase the over-advance figure. In addition, at Novedades' request, FNBB disbursed loans into the corporate checking account so that Novedades could pay its most urgent bills such as rent, insurance, and taxes.

On April 19, 1991, to enable Novedades to increase its merchandise stock for Mother's and Father's Day, FNBB agreed to exclude from its factor's lien appliances provided to Novedades on a consignment basis by three separate wholesalers—Supreme Electronics, Caribbean Wholesalers and H & H Sales. To avoid commingling of funds, proceeds from the sales of these appliances were deposited in a separate account. The proceeds of sales deposited in the new account were used to pay the three suppliers of the consigned goods and to repay FNBB loans. By September 4, 1991, it became evident that Novedades would be unable to achieve any significant recuperation. FNBB filed a lawsuit against Novedades for collection of monies owed and to foreclose on the remaining inventory. On October 3, 1991, Novedades filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. As a result of FNBB's filing, FNBB suffered a total loss of $983,000.00.

Despite plaintiffs' initial assertion that FNBB made misrepresentations directly to Imports, it is now undisputed that during the time that Novedades maintained its accounts at FNBB, FNBB officers never spoke with any officer or representative of Imports, or with any of the individual plaintiffs in this case with respect to Novedades credit worthiness, financial situation or contemplated credit sales of appliances by Imports to Novedades.

## II. Discussion

### A. *Applicable Summary Judgment Standard*

The standard for summary judgment is well established. Rule 56(c) of the Federal Rules of Civil Procedure provides:

[Summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Three United States Supreme Court opinions on the use and interpretation of the summary judgment standard guide and influence any determination under Rule 56. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In each of these cases, the United States Supreme Court encouraged the use of summary judgment in appropriate situations. These opinions promote an expansive use of the summary judgment mechanism.

In *Celotex*, the Supreme Court stated:

Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action . . ., [*summary judgment*] *must be construed with due regard* not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also *for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.*

(Emphasis supplied). *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555.

The Supreme Court has indicated that the trial judge's task in considering a motion for summary judgment is to determine

[*w*]*hether a jury could reasonably find either that the plaintiff proved his case by the quality or quantity of evidence required by the governing law or that he did not.* Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It

makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards.

(Emphasis supplied). *Anderson*, 477 U.S. at 254–255, 106 S.Ct. at 2513.

As further stated by the Supreme Court: *If the defendant* in a run of the mill civil case *moves for summary judgment* or for a directed verdict *based on the lack of proof of a material fact, the judge must ask* himself not whether he thinks the evidence unmistakably favors one side or the other but *whether a fair minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.*

(Emphasis supplied). *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

The moving party need only point to the absence of evidence supporting the non moving party's case. *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555. Summary judgment's office is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990). Once the party moving for summary judgment "put[s] the ball in play, averring an absence of evidence to support the non moving party's case," the non movant must then document a factual controversy to defeat summary judgment. *Id.* at 48. The factual controversy must relate to a genuine issue of material fact. *Medina Muñoz v. R.J. Reynolds Tobacco*, 896 F.2d 5, 8 (1st Cir.1990). Whether a fact is material or not to a controversy must be determined in light of the substantive law governing the controversy. *Kennedy v. Josephthal and Company, Inc.*, 814 F.2d 798, 804 (1st Cir.1987).

■ The mere fact that plaintiffs' complaint includes allegations of fraud, schemes, inducements and misrepresentations does not suggest that summary judgment should be viewed with disfavor. To the contrary, in *White v. The Hearst Corporation*, 669 F.2d 14, 17 (1st Cir.1982), the First Circuit held that summary judgment standards in fraud or conspiracy cases are not different from the standards employed in any other civil case. In *Milton v. Van Dorn Company*, 961 F.2d 965 (1st Cir.1992), the First Circuit affirmed the entry of summary judgment in a fraud case "because from the countervailing objective evidence, as well as the inherently contradictory nature of [plaintiff's] statements, we are convinced that a reasonable jury couldn't find from the competent evidence in the summary judgment record" that defendant defrauded plaintiff. *Id.* at 972.

The non-movant cannot rest upon mere allegations. Fed.R.Civ.P. 56(e). The non-movant must instead affirmatively show that "sufficient evidence supporting the claimed factual dispute [exists] to require a jury or judge to resolve the parties' differing versions of [the] truth at trial." *First National Bank v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). On issues where the non-movant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion. *See Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514–15; *Garside*, 895 F.2d at 48.

■ Pursuant to Rule 311.12 of the Local Rules for the District of Puerto Rico, all material facts set forth by the movant in conjunction with a motion for summary judgment will be deemed admitted unless controverted by a similar statement filed by the opposing party. *See also, Zurita v. Virgin Islands Daily News*, 578 F.Supp. 306 (D. Virgin Islands 1984); (the legal effect of the failure of non-moving party to controvert facts supporting summary judgment motion is that facts are deemed admitted); *Cutler v. Lewiston Daily Sun*, 103 F.R.D. 172 (D.Me. 1984) (failure to file response to movant's statement of undisputed facts will result in motion being decided on the basis of movant's submissions); *Cassidy v. Welfare & Pension Fund for the Mid–Jersey Trucking Indus.*, 580 F.Supp. 175 (E.D.Pa.1983) (fail-

ure to respond to summary judgment motion will result in uncontested assertions being taken as established facts for purposes of granting the motion).

### B. The Individual Plaintiffs' Claims

■ It is a basic principle of corporate law that corporate rights of action are distinct from stockholders' rights. Where a cause of action exists in favor of a corporation, an action must be brought by the corporation itself in the corporate name, and cannot be brought by a stockholder on his or her own behalf. *In re Dein Host, Inc.*, 835 F.2d 402 (1st Cir.1987). As the First Circuit has stated:

> A stockholder of a corporation does not acquire standing to maintain an action in his own right, as a shareholder, when the alleged injury is inflicted upon the corporation and the only injury to the shareholder is the indirect harm which consists in the diminution in value of his corporate shares . . .

*Id.* at 406 (quoting *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 732 (3rd Cir.1970)).

■ Even when all the stock of a corporation is owned by a sole shareholder, the corporation and its shareholders are to be treated as distinct legal persons. *W. Clay Jackson Enterprises v. Greyhound Leasing & Financial Corporation*, 463 F.Supp. 666 (D. Puerto Rico 1979).

■ Mr. and Mrs. Couso seek an award of $1 million; however, they are not entitled to exercise a personal cause of action as a result of the damages allegedly suffered by Imports. All the causes of action raised by plaintiffs are based upon damages allegedly caused by FNBB to Imports. The crux of the complaint is the alleged wrongful conduct of FNBB with regard to coplaintiff Imports. Therefore, as Mr. and Mrs. Couso have failed to state any facts which would entitle them to

sustain a cause of action against FNBB; they have no standing to sue FNBB to redress alleged damages suffered by Imports.[10]

### C. The Allegations of Fraud

■ Under Puerto Rico law, a party charging fraud must establish four elements: (1) that a false representation was made to consummate the fraud; (2) that the fraud was consummated by virtue of such a representation; (3) that there was an intent to defraud; and (4) that there was justifiable reliance upon the misrepresentation. *In re Las Colinas, Inc.*, 294 F.Supp. 582 (D. Puerto Rico 1968); *see also Monclova v. Financial Credit Corp.*, 83 P.R.R. 742, 747–748 (1961) (false statement of fact and intention to induce plaintiff are required elements of fraud action); *Carrasquillo v. Lippitt & Simonpietri*, 98 P.R.R. 659, 669 (1970) (reliance is required element of fraud action).

■ A party alleging fraud must prove its existence with uncontroverted and unchallengeable evidence. *Monclova*, 83 P.R.R. at 747. The party "must produce evidence which is strong, clear, unchallengeable, convincing, and conclusive, since a mere preponderance of the evidence is not sufficient to establish the existence of fraud in [Puerto Rico]." *Calzado v. Carrero*, 15 P.R.R. 340 (1909); *see also Ana Maria Sugar Co. v. Castro*, 28 P.R.R. 225 (1920); *Muñiz v. Rodriguez*, 51 P.R.R. 662 (1937). "Mere conclusions, conjectures, and suppositions or suspicions are not of themselves sufficient to substantiate an allegation of fraud." *Serrano v. Torres*, 61 P.R.R. 157, 161 (1942). The unreasonableness of a plaintiff's reliance may be regarded as sufficient evidence that he did not in fact rely upon the claimed false representation. *See Planned Credit of Puerto Rico, Inc. v. Page*, 103 P.R.R. 341, 355 (1975) (one who has knowledge, experience, and

---

10. Mr. and Mrs. Couso do not have a cause of action for deprivation of their *investment* in Imports as shareholders either. "It is well established principle of corporate law ... that an individual stockholder who alleges diminution of the value of his investment by reason of an injury to the corporate entity does not state a cognizable claim." *W. Clay Jackson Enterprises v. Greyhound Leasing*, 463 F.Supp. at 670 (citing to *Loeb v. Eastman Kodak Co.*, 183 F. 704 (3rd Cir. 1910)). "The diminution in value of a stockholder's investment is a concomitant of the corporate injuries resulting in lost profits. A fortiori, any redress obtained by the corporations would run to the benefit of their stockholders, and to permit the latter to proceed with those claims would permit a double recovery." *Id.*

88

competence in pertinent business matters cannot be attributed an ingenuity almost inexistent in a world of business in which he was involved).

■ 1. Fraudulent Inducement. In the instant case, no reasonable jury could find that FNBB defrauded Imports by inducing it to sell appliances on credit to Novedades. Imports has failed to present any facts which demonstrate that its claims have any basis. Plaintiffs allege that FNBB deceived and mislead Imports by inducing it to accept post-dated checks from Novedades by representing that the checks would be honored at the time of presentment. However, plaintiffs do not support their allegation with the date or dates on which the alleged representations were made, or the name or names of bank officials who allegedly made the representations. FNBB, on the other hand, has presented evidence establishing that FNBB's officials never made any representations to Mr. Couso or any other person at Imports. In a deposition taken by FNBB, Mr. Couso admitted that FNBB officials never made any representations to him (Couso's deposition at 37–42 and 44–45). In fact, Mr. Couso admitted that it was two of his business competitors—Carlos Leal of Carley Distributing Corporation, and Robel Perea of Victor Electronics—who told him about a conversation they allegedly had with FNBB's officers in which they had been encouraged to supply Novedades with appliances on credit (Couso's deposition at 37–38). Mr. Couso also admitted that he did not confirm the information that his competitors gave him with any officer of FNBB (Couso's deposition at 38). Mr. Couso is not entitled to bring a cause of action for relying on statements made by his business competitors. FNBB can only be held responsible for statements of its agents.

Even if Mr. Couso's competitors could be construed to be agents of FNBB, FNBB has presented information showing that Imports could not have relied on such representations in making the decision to supply Novedades with merchandise in exchange for the five post-dated checks. Mr. Couso admitted that

he delivered the merchandise paid for with post-dated checks to Novedades between October 5, 1990 and November 9, 1990, while the alleged statements by Mr. Leal and Mr. Perea were made after April 23, 1991. (Couso's deposition at 48–50). Furthermore, Mr. Couso admitted that he had been selling appliances to Novedades on credit and accepting post-dated checks from Novedades in exchange for merchandise for approximately ten years (Couso's deposition at 92–94). Thus, not only is a material misrepresentation absent in this case, but it is also evident that Imports could not have been induced to sell merchandise to Novedades by the statements made by Mr. Leal or Mr. Perea since these were made approximately five to six months *after* Imports sold the merchandise to Novedades and there is evidence that it was Imports' practice to accept post-dated checks from Novedades. Furthermore, the comments made by Mr. Leal and Mr. Perea were so unspecific that no business man with the experience of Mr. Couso [11] could have justifiably relied on them.

■ 2. The Financing Agreement. Puerto Rico law specifically recognizes and provides for factor's liens secured financing. 10 L.P.R.A. §§ 552 *et seq.* A bank is entitled to make an agreement with its borrower that will protect the bank's interest. *See Aaron Ferer & Sons Limited v. The Chase Manhattan Bank,* 731 F.2d 112 (2d Cir.1984). Moreover, the establishment of a depository account for a debtor to deposit all proceeds from encumbered inventory may be necessary to prevent the commingling of funds of a debtor and to preserve the bank's lien over such funds. *See Benedict v. Ratner,* 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991 (1925).

■ Plaintiffs complaint suggests that there is something fraudulent about the way FNBB structured and handled Novedades' accounts. The Court construes plaintiffs claims in this area to be the following: (1) Imports' five checks were dishonored because defendant fraudulently depleted Novedades' corporate checking account by apply-

11. In his deposition Mr. Couso stated that he had been in the same business for approximately

thirty years (Couso's deposition at 124).

ing funds in the account to the reduction of Novedades' debt with the bank and (2) the financing agreement between FNBB and Novedades was itself fraudulent. Plaintiffs have not presented any evidence based on which a jury could reasonably make findings supporting these claims.

FNBB, on the other hand, has presented evidence establishing that it could not have depleted Novedades' corporate account by applying the account's funds to the reduction of Novedades' debt to FNBB. In a sworn statement, Mr. Rosado states that funds in Novedades' corporate account were never applied towards the reduction of the loans disbursed by FNBB to Novedades (Rosado's sworn statement at 7). Pursuant to the financing agreement executed by FNBB and Novedades, all payments made towards the amortization of loans were made from the funds deposited in the depository account (Rosado's sworn statement at 7).

The Court cannot find anything illegal in the financing agreement between FNBB and Novedades. The facts in this case are similar to those present in the *Aaron Ferer* case. *Aaron Ferer*, 731 F.2d at 115. The borrower in that case, like Imports, agreed to assign all its account receivables to the bank providing it with a revolving credit line, maintained a depository account in which the proceeds from its accounts receivable would be deposited, and agreed with the bank that funds from the depositary account would be used to reduce the outstanding loans made by the bank. *Id.* at 115. The Court found no problem with this arrangement. Similarly, we find no merit to plaintiffs' naked allegation that the application of the funds deposited in the depository account for the amortization of the loans somehow defrauded Imports. FNBB had a valid lien over these funds to the exclusion of any other creditors and, pursuant to the agreement between the bank and Imports, FNBB properly applied the deposits made in the depository account to the amortization of the loans disbursed under the line of credit.

■ 3. Competing Checks, Manager's Checks and Certified Checks. The relationship between a bank and a checking account holder is contractual. A bank has an obligation to honor and pay the checks presented to it for payment, but only to the extent that a positive balance appears in the bank's book of account. *Rios v. The National Citibank of New York*, 51 P.R.R. 473, 478 (1937); *Herrera v. First National City Bank*, 103 P.R.R. 1004, 1008 (1975); *Portilla v. Banco Popular*, 75 P.R.R. 106–107 (1953). Therefore, it is not illegal or fraudulent for a bank to pay checks presented to it only to the extent that there are sufficient funds in the account to cover the checks. When, on any given day, the payment of every check presented would create an overdraft in an account, a bank may pay off the checks presented in any order convenient to the bank. *See Hamilton National Bank v. Swafford*, 213 Tenn. 545, 550–553, 376 S.W.2d 470, 475–477 (1964) (bank could properly pay check drawn to the order of the bank itself and dishonor another check not payable to the bank); *Security Trust Company v. First National Bank*, 79 Misc.2d 523, 358 N.Y.S.2d 943, 949 (1974) (bank could properly chose to pay only three checks of thirteen received from another bank while dishonoring the remaining ten checks). Moreover, it is not wrong or illegal for a bank to disburse a loan into the checking account of a borrower for the specific payment of debts that the borrower wishes to pay at any given time even though other creditors' checks have not been paid due to insufficient funds in the account. *See Atlantic Cement Co. v. South Shore Bank*, 730 F.2d 831, 834 (1st Cir.1984). Even if a bank wrongfully dishonors a check in order to protect its own interests, the holder of the check has no recourse against the bank. *Southeastern Pipeline Serv., Inc. v. Citizens & S. Bank of Thomas County*, 617 F.2d 67 (5th Cir.1980). A check of itself does not operate as an assignment of any part of the funds to the credit of the drawer with the bank, and the bank is not liable to the holder, unless and until it accepts or certifies the check. 19 L.P.R.A. § 366.

■ Plaintiffs aver that Novedades' account was fraudulently depleted of funds because FNBB's officials discriminatorily substituted some checks with manager's checks or certified checks and selectively refused payment of some of Novedades' post-dated

checks while at the same time selectively honoring other post-dated checks. Plaintiffs have not submitted a scintilla of evidence to support its allegations of fraud in this area. Since a bank is permitted to honor some checks and dishonor others when there are not sufficient funds in an account to cover all the checks presented to the bank, plaintiffs allegations without more cannot amount to fraud. Mr. Rosado's sworn statement establishes that while there were sufficient funds in Novedades account FNBB paid all checks drawn by Novedades (Rosado's sworn statement at 26). Thereafter, some checks were paid while others were not due to the fact that the payment of all checks drawn would have greatly exceeded Novedades' maximum credit availability under the line of credit (Rosado's sworn statement at 26). There were indeed checks drawn by Novedades which were substituted with certified checks or manager's checks;[12] however, in these instances there were either sufficient funds in Novedades' corporate account to pay the checks or FNBB disbursed loans under the line of credit into the checking account at the request of Novedades for the payment of the specific checks that were paid (Rosado's sworn statement at 27).

The parties have not brought to the Court's attention, and the Court's own research has not uncovered, any law that would have prohibited FNBB from disbursing loans into Novedades' checking account at its request and for the payment of specific checks issued by it. Thus, plaintiffs have not presented any evidence to support their allegations that FNBB fraudulently depleted Novedades' account by discriminating against competing checks or substituting certain checks with manager's or certified checks. Plaintiffs have not presented any facts that would allow it to have recourse against the bank even if it could prove its five checks were wrongfully dishonored.

■ 4. The Bank's Setoff Against the Corporate Account. A bank has a right to appropriate the deposit of its customer to satisfy debts owed to it by the customer. *See Marine Midland Bank–N.Y. v. Graybar*

*Elec. Co.*, 51 A.D.2d 903, 380 N.Y.S.2d 238 (1976). This is referred to as a bank's right to exercise "setoff." *See Id.* This is true whether the customer's debt is created by an overdraft on the checking account or by an over-advance in a commercial line of credit. The bank is entitled to immediate satisfaction and generally has priority over any regular check holder to the funds deposited with it. *See West Side Bank v. Marine National Exchange Bank,* 37 Wis.2d 661, 155 N.W.2d 587 (1968).

■ Plaintiffs allege that, "[FNBB] made numerous offsets (sic) against the extended credit it had afforded [Novedades] as a scheme to protect its collateral ... while defrauding [Novedades'] creditors." The Court construes plaintiffs allegation to be the following: FNBB defrauded Imports by using funds from the line of credit to reimburse itself for the payment of overdrafts in Novedades' corporate account. Plaintiffs again have failed to provide any evidence which reveals fraudulent conduct by FNBB. When FNBB increased Novedades line of credit and used part of the new loans disbursed to Novedades' to reimburse itself for the payment of overdrafts in Novedades account, FNBB was doing nothing more than exercising its legal right to setoff. Imports has not submitted any evidence that could lead a reasonable juror to find that FNBB's exercise of setoff was fraudulent.

■ 5. The Opening of a Third Account. Plaintiffs claim that FNBB acted fraudulently by using funds deposited by Novedades to extend credit advances to other creditors of Novedades. FNBB admits that Novedades opened a separate account with the bank to deposit proceeds from the merchandise provided to Novedades by other suppliers on a consignment basis (Rosado's sworn statement at 21). FNBB also admits that the funds deposited in this account were used exclusively to pay the suppliers of the consigned merchandise and to cure the over-advance of loans made by FNBB to Novedades (Rosado's sworn statement at 21); however, plaintiffs have presented no evi-

---

12. A total of four manager's checks were issued by FNBB to substitute checks issued by Nove-

dades against the corporate checking account (Rosado's sworn statement at 25).

dence showing how the opening of this account defrauded Imports or caused Novedades' corporate checking account to be depleted. FNBB had a legitimate interest in preventing proceeds from the consigned merchandise from getting commingled with proceeds obtained from merchandise which was subject to the bank's factor lien. *See Benedict v. Ratner*, 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991 (1925). There was nothing fraudulent about applying funds in the new account to the reduction of FNBB's over-advance since by doing this the bank was merely exercising its right to setoff.

### D. *Control Liability Theories*

Plaintiffs allege that FNBB is liable to Imports for the non-payment of the five postdated checks since FNBB exerted unlawful control over Novedades. Plaintiffs allege that FNBB "exert[ed] absolute control over [Novedades'] operations and assets, requiring personal collateral from its principals and diminishing even the stockholder's equity to reduce to almost nil [Novedades'] value" and that "[FNBB] specifically and repeatedly determined the sequence in which check payments would be made, collected funds discriminately, paid bills at its sole discretion and determined which creditors and/or suppliers were paid and when." In addition, plaintiff alleges that FNBB, through its power to periodically monitor and audit, managed Novedades' operation in an unsound and unsafe manner. Plaintiffs do not set forth any legal theory under which FNBB could be liable to them for taking these alleged actions. However, the Court construes plaintiffs allegations as assertions of causes of action under lender liability and "instrumentality" doctrines.

■ 1. Lender Liability. Lenders have traditionally been held to have no duty to third parties dealing with their borrower; therefore, generally lenders are not liable for the debts, contractual obligations or torts of their borrowers. *Bradler v. Craig*, 274 Ca. App.2d 466, 79 Cal.Rptr. 401 (1969); *see also Butts v. Atlanta Federal S. and L.*, 152 Ga. App. 40, 42, 262 S.E.2d 230, 232 (1979) (lender's ability to control disbursement of loan proceeds did not give rise to duty towards borrower's creditors).

■ Plaintiffs have presented no allegations or evidence showing that a relationship existed or was created between FNBB and Imports that could give rise to any duty on FNBB's part. Therefore, FNBB cannot be held liable to Imports for the debts of Novedades under a theory of lender's liability.

■ 2. The "Instrumentality" Doctrine. There are situations in which a corporation may be held liable for the debts of another corporation under a theory known in corporate law as the "instrumentality" doctrine. Under the "instrumentality" doctrine a corporation or a bank may be held liable for the debts of another corporation when it misuses that corporation by treating it as a mere business conduit for the purposes of the dominant corporation or bank. *Krivo Industrial Sup. Co. v. National Distillers and Chemical Corp.*, 483 F.2d 1098, 1102 (5th Cir.1973) (citing generally 1 W. Fletcher, Cyclopedia of the Law for Private Corporations § 43 (1963)). The rationale for holding the dominant corporation liable for the subservient corporation's debts is that, since the dominant corporation has misused the subservient's corporation form—the form affording the subservient corporation its limited liability—by using it for the dominant corporation's own purposes, the debts of the subservient corporation are in reality the obligations of the dominant corporation. *Id.* Two elements are essential for liability under the "instrumentality" doctrine. First, the dominant corporation must have controlled the subservient corporation, and second, the dominant corporation must have proximately caused plaintiffs' harm through the misuse of its control. *Id.* at 1103. A creditor-debtor relationship does not *per se* constitute control under the "instrumentality" doctrine. *Id.* at 1104. For a creditor corporation to be liable under the "instrumentality" doctrine a strong showing is required that the creditor assumed actual, participatory, total control of the debtor. *Id.* Merely taking an active part in the management of the debtor corporation does not automatically constitute control. *Id.* Creditors may institute broad restrictions on the activities of their debtors.

In *Chicago Mill and Lumber Co. v. Boatmen's Bank*, 234 F. 41 (8th Cir.1916), a bank lent a large sum of money to a mill. To protect its investment the bank had its assistant cashier elected president of the debtor company. The manager of the mill testified that he took orders from either the president of the bank or the assistant cashier who headed the company. After the company went into bankruptcy, another creditor of the company sued the bank alleging that the bankrupt company had been merely an instrumentality of the bank and that the bank's monitoring of the activities of the company entitled the plaintiff to a jury determination of whether or not the company was in fact controlled by the bank. *Id.* at 46. The Eighth Circuit affirmed the District Court's directed verdict in favor of the bank stating that, "the bank was a large creditor and as such largely interested in the prosperity of the company, and most naturally should desire to keep an oversight over its doings." *Id. See also American Southern Trust Co. v. McKee*, 173 Ark. 147, 293 S.W. 50 (1927) (contractual rights entitling banks to send agent to monitor debtor's collateral, loans and collections could not be construed to mean banks controlled debtor). Evidence that a creditor's agent negotiates and consummates settlements of disputed claims or designates the order in which a debtor's creditors are to be paid is not evidence of the control that is necessary to become liable for the debtor's liabilities. *See Krivo*, 483 F.2d at 1111. Even if a creditor approved each and every one of the debtor's business expenditures, this would not *ipso facto* prove control over the debtor corporation. *Valdés v. L.R.G., Inc.*, 810 F.2d 1345 (5th Cir.1987). The ability of a lender to monitor a debtor's expenditure pursuant to a loan agreement represents only a veto power which is negative in nature, and which when exercised in a limited sense, does not amount to domination or control. *Id.* at 1355.

■ Moreover, it was not an exercise of unlawful control to require and obtain additional collateral from Novedades' principals. Under Puerto Rico law, "[a] debtor is liable for the fulfillment of his obligations with all his present and future property." 31 L.P.R.A. § 5171. A bank may receive by conveyance any real property in satisfaction of personal and mortgage debts previously contracted in the course of its dealings. 7 L.P.R.A. § 111(h). A creditor does not incur liability for requesting and obtaining additional guaranties or collateral to secure its outstanding loans. *Rodriguez v. M. Joglar & Co., S. in C.*, 46 P.R.R. 338, 341 (1934); *Rivera v. Banco Industrial*, 49 P.R.R. 692, 704 (1936).

■ Plaintiffs assert that FNBB "exerted absolute control" over Novedades' operations. To support its assertion of absolute control, plaintiffs allege that FNBB determined the sequence in which Novedades' check payments were made, collected funds, paid bills at its sole discretion, determined which and when suppliers were to be paid, and required and obtained personal collateral from Novedades' principals. Also, Plaintiffs refer to FNBB's power to periodically monitor and audit Imports.

The Court finds that plaintiffs are not entitled to pursue their claim against FNBB on a theory of "instrumentality" because plaintiffs have failed to establish its essential elements. First, plaintiffs have failed to present any evidence that FNBB controlled Novedades, and second, plaintiffs have failed to establish that FNBB's actions proximately caused their harm through the misuse of its control of Novedades.

FNBB, on the other hand, has presented evidence showing that FNBB did not improperly control Novedades. First, Mr. Rufino Rosado testified that FNBB did not collect funds from Novedades' customers (Rosado's sworn statement at 25). The sales proceeds of Novedades were deposited by Novedades in the depositary account and, according to the credit agreement, were applied to the amortization of the loans disbursed under the line of credit. Second, FNBB did not determine the sequence in which check payments were made or which creditors were to be paid. Mr. Rufino Rosado testified that during October 1990, it became evident that the revolving line of credit of $950,000.00 was not sufficient to cover Novedades' working capital necessities and FNBB, believing that there was an excess

collateral availability, agreed to temporarily honor overdrafts up to the approximate sum of $350,000.00. (Rosado's sworn statement at 26.) Thus, all checks presented for payment during the months of October and November were paid; however, during the month of December 15 checks were returned because these checks exceeded the maximum credit that FNBB had approved for Novedades (Rosado's sworn statement at 25–28). During the month of January 1991, checks were returned if, on any given day, the checks presented for payment exceeded Novedades' maximum credit availability. (Rosado's sworn statement at 25). On February 8, 1991, the line of credit was formally increased to the temporal maximum of $1.3 million and the overdrafts in Novedades' checking account paid by FNBB were paid back with the proceeds of the increase in the line of credit; however as of February . 8, 1991, the line of credit was actually taken to its top maximum limit of $1.3 million. (Rosado's sworn statement at 15). Thereafter, checks were honored only if, on any given day, there was a margin under the borrowing base formula. FNBB has admitted that if on any given day checks were presented for payment in excess of the margin available under the borrowing base formula, checks would be paid up to the margin available in any order convenient to FNBB and that Novedades issued some checks which FNBB substituted with certified or manager's checks (Rosado's sworn statement at 27); however, this does not mean FNBB generally determined the sequence in which checks were paid or FNBB paid creditors at its sole discretion. By drawing and delivering checks to its creditors Novedades ordered FNBB to pay the holders of the checks. Mr. Rufino Rosado testified that although the checks which were substituted with certified checks had been dishonored due to the lack of sufficient funds, their holders made constant collecting efforts and Novedades requested FNBB to disburse loans into its corporate checking account to these specific checks (Rosado's sworn statement at 27). Thus, FNBB merely exercised its discretion to take a credit decision of disbursing loans unto the checking account to issue the certified or manager's checks in question (Rosa-

do's sworn statement at 27). Finally, FNBB admits that it requested and obtained additional collateral from Imports (Rosado's sworn statement at 11); however, the Court cannot find anything improper in this since FNBB had a legal and contractual right to do so.

Plaintiffs have not presented any evidence showing that FNBB ever took control of Novedades' operations. There are no allegations that FNBB caused the substitution of officers and employees of Novedades by persons selected by FNBB; that FNBB ever was a stockholder of Novedades; or that FNBB ever held the stock of Novedades in pledge. Moreover, there is no evidence showing that FNBB intervened in Novedades' day to day operations, in the purchase by Novedades of appliances or merchandise for sale, or in the management and sales strategies and business practices of Novedades. Mr. Rufino Rosado testified that FNBB's involvement in Novedades' affairs was restricted to periodically monitoring inventory and auditing Novedades' books, especially after FNBB discovered that Novedades had been overstating the value of its inventory (Rosado's sworn statement at 30). Most significantly, there is no single factual allegation describing or asserting how FNBB's alleged control of Novedades' caused the non-payment of the five checks delivered by Novedades to Imports.

### E. Breach of Contract

■ The elements of a cause of action for breach of contract are (1) a valid contract and (2) a breach by one of the parties to the contract. *Unisys P.R., Inc. v. Ramallo Brothers Printing, Inc.,* 91 J.T.S. 69. In Puerto Rico, contracts are generally only valid between the parties who execute them. 31 L.P.R.A. § 3374. Actions arising out of a contract can be prosecuted only by one contracting party against the other. *Suárez v. Hernández,* 56 P.R.R. · 262, 268–269 (1940); *Pérez Sánchez v. Advisors Mortgage Investors, Inc.,* 92 J.T.S. 61. A stranger to the contractual relationship may demand the fulfillment of a contract successfully only if the contract contains a stipulation in his favor.

*A.L. Arsuaga, Inc. v. La Hood Const., Inc.,* 90 P.R.R. 101, 107–108 (1964).

Plaintiffs claim compensatory damages for breach of contractual obligations; however, plaintiffs do not allege that a contract existed between Imports and FNBB or that Imports was a third party beneficiary of a contract between FNBB and Novedades. Mr. Couso admitted in his deposition that there was no contract between Imports and FNBB (Couso's deposition at 26–27). An examination of the agreement entered into between FNBB and Novedades leads to the conclusion that it contains no stipulation in favor of Imports. Therefore, plaintiffs have failed to present any evidence that could lead a reasonable jury to conclude that FNBB should be liable to plaintiffs for breach of contract.

### F. Breach of Fiduciary Duty

Generally no fiduciary relationship exists between a bank and its depositors or loan customers. *Centerre Bank of Kansas City v. Distributors, Inc.,* 705 S.W.2d 42, 53 (Mo.App.1985); *Paradise Hotel Corp. v. Bank of Nova Scotia,* 842 F.2d 47, 53 (3rd Cir.1988). Therefore, it follows that generally no fiduciary relationship can exist between a lender and a third party creditor of the lender's borrower unless special facts exist which would give rise to such a duty. Plaintiffs claim compensatory damages for breach of fiduciary duties; however, plaintiff have failed to specify what duties were breached or to show that FNBB owed Imports any fiduciary duties. Plaintiffs have not presented any evidence from which a reasonable jury could infer the existence of a fiduciary relationship between FNBB and Imports.

### G. Tortious Interference with a Contractual Relationship

The essential elements of a cause of action for tortious interference with contractual relationships are (1) the existence of a contract with which the defendant interferes; (2) defendant's interference with the contract must be intentional not privileged; (3) an injury must result from the unprivileged interference; and (4) the injury must be the direct result of the direct interference. *General Office Products Corp. v. A.M. Ca-*

*pen's Sons, Inc.,* 115 P.R.R. 727 (1984). A mere expectation or the prospect of gaining certain advantages from a relationship is not enough to fulfill the requirement of a contract. *Dolphin International of Puerto Rico, Inc. v. Ryder Truck Lines, Inc.,* 91 J.T.S. 13. The contract must be a fixed term contract, which means that it cannot be terminable at will. *Id.* Plaintiffs seek compensatory damages from FNBB for FNBB's alleged tortious interference with the contractual relationship between Imports and Novedades; however, plaintiffs have failed to make the necessary factual allegations required to fulfill the most elemental requirement to maintain a cause of action against FNBB for tortious interference with a contractual relationship. It is undisputed that Imports had no fixed term contract with Novedades. Mr. Couso admitted in his deposition testimony that Novedades purchased appliances from Imports at will and at its sole discretion. (Couso's deposition at 25–26). In view of Mr. Couso's admission, it is clear that Imports had only a mere expectation or prospect of selling Novedades merchandise in the future. Thus, plaintiffs are not entitled to pursue an action for tortious interference with a contractual relationship against FNBB.

### H. Negligence

The elements of the cause of action for negligence are (1) a duty recognized by law requiring the defendant to conform to a certain standard of conduct for the protection of others against unreasonable risk; (2) a failure of the defendant to conform to the standard required or breach of the duty; (3) a reasonably close causal connection between the conduct of the defendant and the resulting injury; (4) and actual loss or damage resulting from defendant's action. *Arroyo Arroyo López v. ELA* 90 J.T.S. 101. Plaintiffs seek compensatory damages for FNBB's alleged negligence; however, plaintiff have failed to make any allegations or to present evidence from which a jury could reasonably find that any of the elements necessary to maintain a cause of action for negligence have been satisfied. There is no evidence showing that FNBB owed Imports a legal duty to look after its interests or that FNBB

failed to conform to a required legal standard. Neither are there any factual allegations explaining how FNBB's alleged negligence caused the non-payment of Imports five checks. Therefore, plaintiffs allegations of negligence are untenable.

### III. Conclusion

After carefully assessing the evidence the Court concludes that Plaintiffs have failed to demonstrate that any of their claims made against FNBB have any factual basis and, therefore, the Court hereby GRANTS FNBB's motion for summary judgment.

IT IS SO ORDERED.