**WADSWORTH, INC. d/b/a Thomson International Publishing, Plaintiff,**

v.

**Rodolfo SCHWARZ–NIN, Defendant.**

**Civil No. 93–1541 (JP).**

United States District Court, D. Puerto Rico.

Dec. 11, 1996.

316

Harry R. Segarra–Arroyo, Puerto Nuevo, PR, Francisco J. Amundaray–Rodríguez, Mercado & Soto, San Juan, PR, for Plaintiff.

Siro Gutiérrez–McCormick, San Juan, PR, for Defendant.

## OPINION AND ORDER

PIERAS, District Judge.

The Court has before it plaintiff's and defendant's cross-motions for summary judgment (**docket Nos. 71 and 72**). The Court hereby **GRANTS** the defendant's motion and **DENIES** the plaintiff's motion.

## I. INTRODUCTION AND BACKGROUND

Plaintiff, Wadsworth, Inc. d/b/a Thomson International Publishing ("Thomson") brings this action against Rodolfo Schwarz–Nin, president[1] of Cultural Puertorriqueña, Inc./Nueva Cultural Puertorriqueña, Inc.[2] ("Cultural") for the payment of debt owed by

---

1. Thomson's initial complaint named three directors/officers as defendants. The Court dismissed Thomson's claims against two of those directors/officers, leaving Rodolfo Schwarz–Nin, president of Cultural, the only remaining defendant in this case.

2. Nueva Cultural Puertorriqueña purchased Cultural Puertorriqueña, succeeding the latter in its rights and liabilities.

the corporation. The plaintiff assails the defendant's conduct on two fronts. First, alleging that Schwarz–Nin perpetrated fraud through Cultural, Thomson argues that Cultural's corporate entity should be disregarded and Schwarz–Nin held personally liable. Specifically, Thomson argues that Schwarz–Nin wrote post-dated checks, knowing that there would be insufficient funds on the post-date, in order to induce Thomson to extend further credit to Cultural.

Second, Thomson claims that Schwarz–Nin violated 14 L.P.R.A. § 1404, which provides that:

> "If the directors or officers of any corporation organized under the laws of this Commonwealth, shall knowingly cause to be published or give out any written statement or report of the condition or business of the corporation that is false in any material respect, the officers and directors causing such report or statement to be published, or given out, or assenting thereto, shall be jointly and severally, individually liable for any loss or damage resulting therefrom." (Official Translation)

Thomson points to a forced devaluation of part of Cultural's inventory, due to its obsolescence, that allegedly occurred sometime in 1989 but was not reported in Cultural's financial statements until 1991. This, Thomson appears to argue, induced it to extend credit to Cultural that it otherwise would not have extended, thereby injuring Thomson.

The following facts are undisputed. Cultural Puertorriqueña, Inc., a corporation organized under the laws of Puerto Rico, sells high school and college textbooks at the retail level through company owned stores. In 1989, Cultural was purchased by Nueva Cultural Puertorriqueña, of which Rodolfo Schwarz–Nin was president. Wadsworth, Inc., d/b/a Thomson International Publishing, a Delaware corporation with its principle place of business in California, publishes and distributes high school and college textbooks. Thomson maintains offices in Kentucky and Illinois. Thomson and Cultural developed a contractual relationship, in force from 1989 until February of 1992, whereby Thomson delivered books to Cultural, on credit, and Cultural sold the books to the public.

By late 1990, Cultural had begun experiencing financial difficulties. Under its credit arrangement with Thomson, Cultural was approximately $200,000 in arrears by the start of 1991. Before February 1991, the defendant signed and delivered to Thomson a corporate check for just over $50,000 (check No. 548), post-dated for February 1. *See* Plaintiff's Exhibit 7. That check was intended to reduce Cultural's account debt. It bounced, and the defendant sent a replacement check (No. 729) for approximately the same amount, also dated February 1. The replacement check also bounced. *See* Plaintiff's Exhibit 6. Thomson alleges that it extended additional credit to Cultural based on these partial payments.

Schwarz–Nin signed and delivered a third corporate check for $50,000, dated March 15, 1991 (no record of this check has been forwarded to the Court). That check also bounced. Some time prior to July, he signed and delivered to the plaintiff yet another draft (No. 528), this one for $100,000, post-dated July 30, 1991. When Thomson attempted to redeem this instrument on the post-date, it too was dishonored for insufficient funds. *See* Plaintiff's Exhibit 10A and 12. At the beginning of August, however, Schwarz–Nin signed and delivered to Thomson a certified check for $100,000, dated August 9, 1991, which was honored and credited to Cultural's account. *See* Defendant's Exhibit A.

Sometime prior to August, Schwarz–Nin signed and delivered another check (No. 529) to the plaintiff for $100,000, post-dated August 15, 1991. This one was backed by insufficient funds. *See* Plaintiff's Exhibit 14. In an attempt to resolve the debit this payment was intended to settle, Cultural, through defendant Schwarz–Nin, requested Thomson's permission to pay the $100,000 in ten weekly installments of $10,000. On September 4, Thomson responded with its own offer. This offer required Cultural to pay approximately $22,600, the amount Cultural owed over and above the $100,000, before September 30, 1991, and then to begin paying the weekly $10,000 installments beginning on October 15. *See* Plaintiff's Exhibit 15.

Cultural never paid the $22,600. Schwarz–Nin signed and delivered another corporate check (No. 1009) to Thomson on October 15 [3] for $10,434.12. True to form, this one also bounced. Check number 1009 represents Cultural's final attempt to satisfy its debts. Thomson claims that during the period beginning January 1991 and ending October 1991, its credit manager extended credit to Cultural in the amount of $76,072.11.

On July 13, 1992, Thomson obtained a judgment against Cultural for $148,129.26. *See* Civ. No. 92–1420(JP). Thomson, however, has never been able to execute its judgment against Cultural, which is now in bankruptcy. Thomson filed this action on April 7, 1993, seeking to hold the directors of Cultural liable for Cultural's debt. In its complaint, Thomson presents two theories in support of its claim. Both of these theories boil down to the premise that Schwarz–Nin fraudulently misrepresented Cultural's creditworthiness, thereby causing Thomson to extend credit it otherwise would not have. Thus, Thomson argues, because Schwarz–Nin's fraud caused Thomson to hold unpaid and uncollectible debts, Schwarz–Nin should be held to blame. Thomson asks the Court to hold Schwarz–Nin liable for Cultural's entire debt, not just for the additional credit extended after January 1991.

On December 9, 1994, the Court granted the directors' motion to dismiss Thomson's complaint as inadequate under Rule 9(b) of the Federal Rules of Civil Procedure. Specifically, the Court agreed with the defendants that the complaint did not allege fraud with the requisite specificity. Thomson subsequently amended its complaint. On March 4, 1996, the Court dismissed Thomson's amended complaint as to Angel Collado–Schwarz and Juan Zalduondo–Viera, leaving Schwarz–Nin as the sole defendant. The remaining parties have filed cross-motions for summary judgment, which are now before the Court.

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides:

> "[Summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The purpose of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for a trial." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990). Usually, this entails the following methodology. First, the court must identify material factual disputes, drawing all reasonable inferences in favor of the party against whom summary judgment is sought. *See Kennedy v. Josephthal & Co.*, 814 F.2d 798, 804 (1st Cir.1987); *but see Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990) (a court need not credit "conclusory allegations, improbable inferences, and unsupported speculation"). If there are material factual disputes, summary judgment is inappropriate. Where there are none, the court proceeds to search the undisputed facts in an effort to discern whether the moving party has shown that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Where the moving party would bear the burden of persuasion at trial, it must first show that there is no genuine dispute as to the material facts, and then it must satisfy the burden it would have at trial. To do this, it must show that it would be entitled to a directed verdict at trial. *Id.* Where the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the non-mov-

---

**3.** There appears to be some discrepancy in Thomson's discussion about check number 1009. In its motion for summary judgment, Thomson states that Schwarz–Nin delivered the check on October 15. In Plaintiff's Exhibit 17, however, a letter from Thomson to Schwarz–Nin, dated October 16, Thomson states that the check was post-dated. The check was dated September 30, 1996, so if it were truly post-dated, Schwarz–Nin must have delivered it prior to September 30. However, this discrepancy is of no significance, for the Court would arrive at the same conclusion regardless of how this conflict is resolved.

ing party's case." *Id.* at 325, 106 S.Ct. at 2554. In other words, when the moving party does not bear the burden of persuasion, it must establish that no reasonable judge or jury could find that the non-movant had established the requisite elements of its claim. If the moving party has not met its respective summary judgment standard, the motion should be denied.

However, where the moving party has met its initial burden of proof, the burden shifts to the non-moving party to show that some triable issue, whether factual or legal, remains unresolved. If it succeeds, the motion must be denied; if it does not, the motion will be granted.

■ Where, as in the case at bar, the parties agree to all the relevant facts, the Court must look to those facts and determine whether the moving party has shown that it is entitled to judgment on the legal issues. Where the issue would be one for the jury at trial, the moving party must show that, given the undisputed facts, no reasonable jury could find that the party bearing the burden of persuasion at trial had either established or failed to establish all required elements, depending on whether the movant bears the burden at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Under these circumstances, where parties cross-move for summary judgment, as Thomson and Cultural do, the court may find that either one or neither prevails on summary judgment. *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228 (1st Cir.1996). Where, however, the judge would have the task at trial of interpreting undisputed evidence in order to reach a legal conclusion, the calculus is less demanding. The First Circuit has recognized that a bench trial may be unnecessary where the judge has all the evidence before him on summary judgment. *See Posadas de P.R. v. Radin*, 856 F.2d 399, 400 (1st Cir.1988); *c.f. also Weinberger v. Hynson, Westcott & Dunning*, 412 U.S. 609, 622, 93 S.Ct. 2469, 2479, 37 L.Ed.2d 207 (1973) ("if this were a case involving trial by jury as provided in the Seventh Amendment, there would be sharper limitations on the use of summary judgment"). In such cases, the court can then turn the cross-motions for summary judgment into a "paper trial," and simply determine which party has prevailed in persuading the court that it is entitled to judgment. This is such a case.

Neither party to this case has made a proper demand for a jury trial under Fed. R.Civ.P. 38(b), and the parties have waived any right to trial by jury. Fed.R.Civ.P. 38(d). The issues would have been tried by the court if the case went to trial. Fed. R.Civ.P. 39(b). Therefore, the Court shall look at the evidence propounded by the parties in support of their cross-motions for summary judgment, and shall render judgment as to all issues as though at trial.

## III. ANALYSIS

### A. Fraud

#### 1. The Cause of Action

■ Thomson argues that fraud on the part of the corporation implicates the equitable remedy of piercing the corporate veil. In other words, if the corporate form was utilized by the corporate officers or shareholders to commit fraud, a court will discard the legally fictitious corporate entity and its consequent liability shield to hold those responsible shareholders or officers liable. The equitable remedy of piercing the corporate veil is most frequently connected with cases of shareholder liability. The corporate liability shield is really designed to protect the owners of the corporation by limiting liability to the amount the owners have invested. Courts will disregard the corporate entity when these owners utilize that entity to engage in wrongdoing, and when the corporate entity is really but a mere instrumentality of its owners. The logic behind piercing the corporate veil in order to hold its owners liable does not readily apply to officers and directors *qua* officers and directors, for they do not sit behind the corporate veil. However, "it is well settled that an officer is personally liable for his actions and cannot seek refuge in the fact that he was acting for the corporation." *Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc.*, 764 F.2d 928, 938 (1st Cir.1985) (citing Massachusetts cases and 3A Fletcher, *Cyclopedia of the Law of Private*

*Corporations,* § 1143, at 228–230 (1975)). Thus, when an officer is accused of committing a tort, even if in her capacity as a corporate officer, the doctrine of piercing may not even be implicated. The plaintiff in this case appears to rely on a piercing theory, but, based on the following analysis, the doctrine Thomson chooses to utilize is irrelevant. Whether the Court chooses to test the strength of the corporate veil or simply treats Schwarz–Nin as an alleged tort-feasor, the case turns on the same question—whether or not fraud was committed under Puerto Rico law. However, because plaintiff has asked the Court to pierce the corporate veil, we proceed with an analysis of the applicability of that remedy to the facts of this dispute.

## 2. Choice-of-Law

■■■ A district court sitting in diversity jurisdiction case must follow state substantive law. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Moores v. Greenberg,* 834 F.2d 1105, 1107 (1st Cir.1987). The district court is to apply the substantive law, including the choice-of-law rules, of the jurisdiction in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–1022, 85 L.Ed. 1477 (1941). When the highest court in the jurisdiction has not spoken on the question at issue, the district court is obligated to determine how that tribunal would resolve the matter. *Moores,* 834 F.2d at 1107. The court should "look to 'such sources as analogous state court decisions, adjudications in cases elsewhere, and public policy imperatives.'" *Ryan v. Royal Ins. Co. of America,* 916 F.2d 731, 734–735 (1st Cir.1990) (quoting *Kathios v. General Motors Corp.,* 862 F.2d 944, 949 (1st Cir.1988)).

Although the parties have made their arguments under the assumption that Puerto Rico law applies, the Court does not concede that point without analysis.[4] As noted, this Court, sitting in a diversity case, applies the choice-of-law rules of the forum state. *Klaxon.* However, neither the Puerto Rican courts nor the Puerto Rican legislature has thoroughly addressed the question of what law must apply to piercing the corporate veil. With respect to tort and contract cases, however, the Puerto Rican courts have adopted the "most significant contacts" test of the Second Restatement. *A.M. Capen's Co. v. American Trad. & Prod. Corp.,* 74 F.3d 317, 321 (1st Cir.1996); *Fornaris v. Amer. Surety Co. of N.Y.,* 93 D.P.R. 29 (1966). We look to the Restatement for guidance on this issue as well.

Generally, "when the subject is liability of officers and directors for their stewardship of the corporation, the law presumptively applied is the law of the place of incorporation." *Resolution Trust Corp. v. Chapman,* 29 F.3d 1120, 1122 (1st Cir.1994). "This venerable choice-of-law principle, known as the internal affairs doctrine, is recognized throughout the states, and by the Supreme Court as well." *Id.* (citations omitted). The Second Restatement of Conflicts has adopted a less rigid version of the internal affairs doctrine:

"The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders, except where, with respect to the particular issue, some other state has a more significant relationship under the priciples stated in § 6 to the parties and the transaction, in which event the local law of the other state will be applied."

*Restatement (Second) Conflicts of Laws* § 309 (1971).[5] Officer liability, however, is

---

4. The standard for piercing, although not widely variant in most states, often diverges enough that the choice of law determines the outcome. *See, e.g., Resolution Trust Corp. v. Chapman,* 29 F.3d 1120 (7th Cir.1994).

5. Section 6. Choice of Law Principles

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

not always solely a matter of internal corporate relationships. Courts "pierce the corporate veil" for a number of reasons, some of which implicate only intra-corporate relationships, such as in shareholder derivative suits, and some of which implicate the interests of third parties outside of the organic structure of the corporation. One can easily envision situations in which the state of incorporation has few significant contacts with and little (or at least less) interest in the outcome of the case and thus, the application of its laws thereto. The drafters of the Restatement addressed this issue:

> "acts done by ... corporate officers in their official capacity may be grouped under two broad categories. Within the first category fall acts, such as the issuance of stock and the declaration of dividends, which closely affect the organic structure or internal administration of the corporation. Issues relating to the validity of such acts, and to any resulting liability on the part of the directors and officers, cannot practicably be determined differently in different states ... the local law of the state of incorporation will be applied in the great majority of instances to determine issues of this sort. Within the second category fall acts, such as seizing a corporate opportunity or causing the making of a contract or the commission of a tort. Issues relating to the liability of the directors and officers for acts such as these can practicably be decided differently in different states. It would be practicable, for example, for a director to be held liable for a given act in one state and to be held not liable for an identical act in another state ... The local law rule of a state other than the state of incorporation is most likely to be applied in a situation where this rule embodies an important policy of the other state and where the corporation has little contact with the state of its incorporation."

*Restatement (Second) Conflict of Laws* § 309, cmt. c (1971). *C.f., e.g., Anderson v. Abbott,* 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793 (1944) (states have the power to create

corporate liability shield, but "no state may endow its corporate creatures with the power to ... defeat ... federal policy"—applying federal common law to question of piercing the corporate veil). We interpret the relevant section of the Restatement to mean that, when determining whether to pierce the corporate veil, the law of the state of incorporation presumptively applies, but that presumption can be rebutted. Where the basis for piercing stems from non-internal affairs, we look to see if another state's interest in officer liability from those affairs is greater enough than the interest of the state of incorporation to defeat the presumption. *See Resolution Trust Corp. v. Chapman,* 29 F.3d at 1126–1127 (J. Posner, dissenting).

■ In this case, the plaintiff has proposed fraud as the basis for piercing the veil. The facts out of which this action arises implicate the external affairs of the corporation as much, if not more, than the internal. Therefore, in order to determine which law governs, the Court applies Puerto Rico's choice-of-law rules to the underlying transaction. *Klaxon.* The underlying transaction comprises the contracts between Thomson and Cultural for the sale of textbooks and, more importantly, the allegedly fraudulent series of insufficient funds checks. From the facts surrounding these transactions, the Court finds that no state has more significant contacts than Puerto Rico.

Thomson is organized as a Delaware Corporation, has its principle place of business in California, and maintains some of its offices in Kentucky and Illinois. Cultural is a Puerto Rico corporation with its principle place of business in Puerto Rico. Aspects of the transactions underlying this case occurred in the following manner. Under the contract, Thomson distributed its books, presumably from California, to Puerto Rico. As payment, Cultural drew checks on its bank account in Puerto Rico, sent them to Kentucky, to be deposited in Chicago. The theory of the fraud alleged by Thomson is that the insufficient funds checks constituted an intentional misrepresentation. In general, two components constitute a fraud: the represen-

---

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result.

tation and the injury. Here, the injury resulting from the alleged falsity occurred in any number of states—wherever Thomson experienced a loss. We consider California, as Thomson's principal place of business, to hold the paramount interest in that loss. *See Restatement (Second) Conflict of Laws* § 148, cmt. i (1971). Schwarz–Nin perpetrated the allegedly fraudulent conduct in Puerto Rico. The alleged misrepresentation was made in Puerto Rico, from whence the checks issued, and where the funds, the object of the alleged misrepresentation, were supposed to be located. The contract underlying the fraud was also centered in Puerto Rico, where Thomson shipped the goods and Cultural received and sold them. We do not believe that the contacts that any other state has to this action justify rebutting the presumption that Puerto Rico law governs the liability of officers of Puerto Rican corporations for the debts of their corporations. Therefore, we allow Puerto Rican law to govern the determination of Schwarz–Nin's liability.

### 3. Piercing the Corporate Veil

██ Corporate directors, officers, and shareholders are generally not liable for the debts of the corporation. This corporate liability shield represents a fundamental premise of the legal fiction that corporations act in their own right, and constitute wholly separate legal entities unto themselves. *See* 14 L.P.R.A. §§ 1201 and 1202. It is this principle of corporate law, perhaps more than any other, that has led to the widespread use of the corporate structure to house most private business ventures of any magnitude. As a rule, this shield will almost never be dismantled. *See González v. Saint Just,* 101 P.R.R. 240, 244 (1973). There are, however, a variety of exceptions to this canon. Under one exception, courts will not allow directors or officers to use the corporate shield to protect them while they use the corporation to defraud others. Where the directors or officers use the corporation to commit fraud, courts will "pierce the corporate veil" and hold those officers or directors personally liable. *See South Puerto Rico Sugar Corp. v. Junta Azucarera,* 88 D.P.R. 43 (1963); *Cruz v. Ramírez,* 75 D.P.R. 947 (1954). This does not mean that a court will pierce the

corporate veil simply because the corporation experiences economic difficulties and is incapable of paying its debts. A plaintiff hoping to persuade a court to pierce the corporate veil must establish that the directors acted with intent to defraud and that the creditor cannot collect from the corporation the debt owed them. The Supreme Court of Puerto Rico summarized this principle in *Fleming v. Toa Alta Development Corp.,* 96 P.R.R. 234 (1968), where that court held that it is insufficient for plaintiff to rely on an unpaid corporate debt to pierce the corporate veil. "Additional evidence must be offered which would lead to the conclusion that the corporation has been established or that its business has been managed for the purpose of defrauding." *Fleming,* at 244.

Here, Thomson argues that Schwarz–Nin, as president of Cultural, tendered post-dated corporate checks, knowing that Cultural possessed insufficient funds to cover them (and would not possess sufficient funds as of the post-date), to induce Thomson to extend more credit to Cultural. This, Thomson alleges, constitutes fraud and permits the Court to pierce the corporate veil. The Court does not agree.

██ Before we determine whether the checks constituted fraud, we need to revisit the choice-of-law issue. The question of whether a fraud has been perpetrated is distinct from the question of whether a court should disregard a corporate entity, and may be governed by another state's law. Again, under *Klaxon,* we look to Puerto Rico choice-of-law rules to determine which state's definition of fraud governs. Fraud is a tort. As noted above, Puerto Rico employs the Second Restatement for choosing which law governs cases in tort. *A.M. Capen's,* 74 F.3d at 320. With respect to fraud and misrepresentation, the Second Restatement directs us to look at the place of the conduct and the place of the injury. *Restatement (Second) Conflict of Laws* § 148 (1971). Of course, if both the representation and the resultant injury occurred in the same state, that state's law would apply. But where, as here, they do not, the Court must determine which state has the most significant relationship to the

occurrence and the parties, taking into account the following contacts: (a) the place where the plaintiff relied on the representations; (b) the place where the plaintiff received the representations; (c) the place where the defendant made the representations; and (d) the domicile, residence, and nationality of the parties, and the place of performance under the contract.[6] *Id.* Again, we hold that Puerto Rico has the most significant relationship to Thomson's allegation of fraud. First, the representation occurred in Puerto Rico. Second, Thomson relied on the fraud in Puerto Rico, when it released merchandise to Cultural in supposed reliance on the insufficient funds checks. *See Id.* at cmt. f. Finally, the contract was to be performed in Puerto Rico. Because no other states appear to have any more significant contacts to the alleged fraud than Puerto Rico, we apply Puerto Rico law. *See Id.* at cmt. j ("when the plaintiff acted in reliance upon the defendant's representations in a single state, this state will usually be the state of the applicable law, with respect to most issues, if ... this state is the place where the plaintiff was to render at least the great bulk of his performance under his contract with the defendant").

■ In order to prove fraud under Puerto Rico law, a plaintiff must establish: (1) that a false representation was made; (2) that the plaintiff reasonably and foreseeably relied thereon; (3) that the plaintiff was injured by his reliance; and (4) that the defendant intended to defraud the plaintiff. *F.C. Imports v. First Nat. Bank*, 816 F.Supp. 78, 87 (D.P.R.1993) (elements enumerated in different order). "A party alleging fraud must prove its existence with uncontroverted and unchallengeable evidence." *Id.* (citing *Monclava v. Financial Credit Corp.*, 83 P.R.R. 742, 747–748 (1961)). "The party must produce evidence which is strong, clear, unchallengeable, convincing, and conclusive, since a mere preponderance of the evidence is not sufficient to establish the existence of fraud in [Puerto Rico]." *Id.* (quoting *Caldazo v. Carrero*, 15 P.R.R. 340 (1909)) (internal quotations omitted). "Mere conclusions, conjectures, and suppositions or suspicions are not of themselves sufficient to substantiate an allegation of fraud." *Id.* (quoting *Serrano v. Torres*, 61 P.R.R. 157, 161 (1942)) (internal quotations omitted).

### 4. The elements of Fraud

#### a. *False Representation*

Thomson argues that tendering checks that bounce constitutes a false representation. In support of this argument, Thomson first cites *Virgilio Flores, S.A. v. Jerome Radelman, Inc.*, 567 F.Supp. 577 (E.D.N.Y. 1982).[7] *Virgilio Flores*, in turn, followed *Lippman Packing Corp. v. Rose*, 203 Misc. 1041, 120 N.Y.S.2d 461 (1953), in which a corporate president was found liable for fraud when he "issued and delivered a check on the corporate account with insufficient funds to meet the obligation and thus obtained renewal of credit to the corporation and additional merchandise on credit." *Virgilio Flores* at 579–580 (quoting *Lippman Packing*). Based on *Lippman*, the district court held that an insufficient funds check might constitute fraud. The *Virgilio Flores* court, in rejecting the defendant's argument that a post-dated check makes no representation as to the funds in the account, held that post-dating a check constitutes a representation that the fund on which the check is drawn will contain sufficient moneys to cover the check on the post-date. Thus, the *Virgilio Flores* court concluded, if the maker of a post-dated check knew when she delivered the check that the account on which it was drawn would not contain sufficient funds on the post-date, the act of tendering the check constitutes fraud.[8]

---

6. The Second Restatement further instructs us to determine the relative importance of the contacts in light of the purpose sought to be achieved by the relevant tort laws of the potentially interested states.

7. Thomson cites no case law from Puerto Rico as to whether the issuance of post-dated insufficient funds checks constitutes a misrepresentation for

the purposes of proving the elements of fraud or piercing the corporate veil.

8. It should be noted that the court in *Virgilio Flores* did not hold that a bounced, post-dated check constitutes fraud as a matter of law. It only held that such a check *could* constitute fraud, if, at the time the maker wrote the check, she knew that there would be no funds to cover

In the same year that the district court decided *Virgilio Flores,* the Supreme Court issued its decision in *Williams v. United States,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982). In *Williams,* the Court held that the deposit of an insufficient funds check in a federally insured bank does not, in and of itself, violate 18 U.S.C. § 1014, which renders it criminal to knowingly "make a false statement or report, ... for the purposes of influencing in any way the action of certain enumerated financial institutions." *Id.* at 284, 102 S.Ct. at 3091. The Court found that depositing an insufficient funds check did not constitute making a false statement "for a simple reason: a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'" *Id.* Citing the Uniform Commercial Code, the majority held that checks do not, "in terms, make any representation as to the state of petitioner's bank balance," but simply commit the drawer to make good on the obligations if the bank dishonors the draft. *Id.* at 284–285, 102 S.Ct. at 3091–3092.

The full meaning of the *Williams* rule has been flushed out in subsequent opinions. The rule is generally limited to the writing and presentation of the check, and does not govern the use of false information on the check, such as forged or unauthorized signatures, or fictitious bank names, account numbers and amounts. *See United States v. Hord,* 6 F.3d 276, 285 (5th Cir.1993) (citing *United States v. Falcone,* 934 F.2d 1528 (11th Cir.1991) (per curiam), *reh'g granted & opinion reinstated on reh'g,* 960 F.2d 988 (11th Cir.) (en banc), *cert. denied,* 506 U.S. 902, 113 S.Ct. 292, 121 L.Ed.2d 216 (1992); *United States v. Worthington,* 822 F.2d 315 (2nd Cir.), *cert. denied,* 484 U.S. 944, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987); *United States v. Price,* 763 F.2d 640 (4th Cir.1985); *Prushinowski v. United States,* 562 F.Supp. 151 (S.D.N.Y.), *aff'd mem.,* 742 F.2d 1436 (2nd Cir.1983)). However, the *Williams* rule does apply to a scheme of check kiting that utilizes a series of insufficient funds checks, and fraud cannot be proved by the mere tendering of such checks, even in series. *United States v. Cronic,* 900 F.2d 1511, 1515 (10th

Cir.1990) (if a single check does not constitute a representation, neither do a series thereof). Furthermore, although directed at a criminal statute, the reasoning of *Williams* clearly applies to civil actions alleging fraud—if a check is not a representation, it cannot constitute a fraud in civil actions. *See Val–Land Farms v. Third Nat. Bank,* 937 F.2d 1110, 1115 (6th Cir.1991) (applying *Williams* to a civil suit for fraud: "it is well settled that writing a check does not constitute a representation").

■ The Court cannot reconcile *Williams* and its progeny with the plaintiff's proposed use of *Virgilio Flores,* and so cannot find support in the latter for the plaintiff's contentions. We follow the rule in *Williams* and hold that a check is neither a statement nor a representation, and therefore, an insufficient funds check is not a false statement or misrepresentation. This holding is in harmony with the generally accepted notion that a postdated check, as opposed to other checks, is more akin to a promissory note than a typical draft. *See Griffin v. Commissioner,* 49 T.C. 253, 261, 1967 WL 1261 (1967) ("A postdated check is not a check immediately payable but is a promise to pay on the date shown ... [and] is essentially a promissory note"); *C.f. also Alkap, Inc. v. Demarest Supply Co., Inc.,* 54 B.R. 151, 154 (Bkrtcy.D.N.J.1984). Whereas the use of a present- or past-dated check to induce transfer of value may constitute a misrepresentation, there is no fraud in the non-payment of a postdated check, just as there is no fraud in the non-payment of a promissory note.

■ Thomson propounds a second basis for arguing that issuing an insufficient funds check is tantamount to a false statement. Section 265 of the Penal Code of Puerto Rico (33 L.P.R.A. § 4552), states that:

"To draw, issue, endorse or deliver a check, draft or order, the payment of which is refused by the drawee, for insufficient funds ... shall constitute prima facie evidence that the drawer or endorser had knowledge of the insufficiency of funds." (Official Translation).

it—i.e. she had no intention of paying the money represented by the check.

Furthermore, Section 267 (33 L.P.R.A. § 4554) provides that:

"Nonpayment after [the holder notifies the maker to pay the holder] on the part of the person who has drawn, signed, endorsed or delivered said check, draft, note or order shall be deemed prima facie as intent to defraud." (Official Translation).

Thomson argues that if, under these criminal statutes, nonpayment of an insufficient funds check can establish prima facie evidence of intent to defraud, a check must be considered a statement. We disagree.

As discussed, fraud comprises four elements, one of which is intent to defraud, and a second of which requires the defendant to have made a false representation. Thomson attempts to use Section 267, which holds that, in a criminal context, nonpayment of a bounced check after mandatory notice[9] creates a presumption of intent to defraud, to argue that such nonpayment must also encompass a presumption that a misrepresentation was made. However, if Section 267 can be read to say that non-payment must implicitly encompass a second element of fraud, we can see no reason nonpayment would not encompass all elements of fraud. Under such an interpretation, the nonpayment of any bounced check, following notification, would constitute fraud. In addition to the fact that such a translation is unprincipled as a matter of statutory interpretation,[10] we find the result it would necessarily produce unrealistic. Therefore, without addressing the "intent" element of fraud, the Court finds Thomson's argument, that the penal code requires us to hold that signing a check forms a representation, unfounded.

Because the post-dated checks at issue in this case do not constitute false statements by themselves, the Court looks to the factual record to find evidence of any actual statements by Schwarz–Nin that were intended to induce Thomson to advance more credit to Cultural. We find none. Thomson has pointed to no expression by Schwarz–Nin

(other than the post-dated checks) to the effect that the post-dated checks be used to secure additional credit. For his part, Schwarz–Nin specifically avers that he never "move[d] Thomson to grant Cultural additional credit." The Court holds that Thomson has failed to establish that Schwarz–Nin committed the first element of fraud.

*b. Reliance*

 Under Puerto Rico law, for a cause of action for fraud to lie, not only must the defendant have misrepresented a fact to the plaintiff, but the plaintiff must have relied on that misrepresentation. *F.C. Imports,* 816 F.Supp. at 87. Moreover, the plaintiff's reliance must have been reasonable. *Id.* As expressed by the Puerto Rico Supreme Court, the unreasonableness of the plaintiff's reliance may be regarded as sufficient evidence that he did not in fact rely upon the claimed false representation. *Id.* (citing *Planned Credit of Puerto Rico, Inc. v. Page,* 103 P.R.R. 341, 355 (1975) ("one who has knowledge, experience, and competence in pertinent business matters cannot be attributed an ingenuity almost [non]existent in a world of business in which he was involved")).

 Thomson claims that it relied on the post-dated checks as proof of payment in order to advance additional credit to Cultural. Thomson also alleges that between January and October of 1991, it extended $76,072.11 to the defendants. The Court finds this reliance to have been unreasonable.

As an initial matter, credit extended prior to Cultural's issuing any of the post-dated checks, which Thomson allegedly relied on, could not have been extended in reliance on those checks. In its motion, Thomson argues that Schwarz–Nin should be held liable for the entire debt of the corporation, even that incurred prior to his issuing the insufficient funds checks. This is nonsensical, for it is axiomatic that an act cannot induce that which was done prior to the act. Thomson cannot seriously contend that Schwarz–Nin's

---

**9.** *See* § 266 of the Puerto Rico Penal Code (33 L.P.R.A. § 4552).

**10.** The Puerto Rican legislature expressly specified that nonpayment leads to a presumption of

intent. If they had wished nonpayment to constitute a prima facie evidence of any other element of fraud, they would have done so expressly.

issuance of insufficient funds checks in 1991 caused the debt accrued prior to the issuance of those checks. Furthermore, Thomson has not broken down the credit extensions by date, so the Court would not be capable of determining those damages to which Thomson would be entitled even if we agreed that Schwarz–Nin should be held personally liable.

Disregarding these problems of specificity, we find that Thomson's reliance on any post-dated checks from Cultural was unreasonable. By the time the defendant issued any post-dated checks, Thomson was clearly on notice of Cultural's financial difficulties. Cultural was nearly $200,000 in arrears on its accounts with Thomson. Furthermore, the corporate checks were post-dated, with Thomson's knowledge, because Cultural did not have sufficient funds at the time the checks were issued to cover those checks. While such checks may constitute a promise on the part of the corporation to pay them on the post-date, they do not establish that reliance on such a promise as a basis for extending additional credit would be reasonable. In the Court's opinion, a creditor, holding a nearly $200,000 debt from a debtor whose credit has been exhausted and whose financial condition is unstable at best, acts unreasonably in relying on post-dated checks, funds for which are not presently available, as a basis for extending additional credit. Additionally, with each succeeding bounced check, such reliance became even less sensible. Therefore, the Court finds that Thomson has not proved the second element of fraud.

### c. Injury

Thomson maintains that Schwarz–Nin should be liable for Cultural's entire debt. As discussed above, this is an untenable position. Thomson might more meritoriously argue that the injury it suffered stemmed from the *additional* credit it extended to Cultural, after the defendant tendered the checks that form the subject of this case. However, even that position is dubious. Many of the instances of alleged fraud occurred between February and the end of July of 1991. On August 8, Cultural paid, via certified check, $100,000 of its debt. That check more than compensates Thomson for the entire amount of additional credit Thomson extended to Cultural beginning in January, 1991. The plaintiff may reasonably argue that, because Cultural already owed it well over $100,000 by January, the August check did not reduce any injury caused by extending the additional credit. But, in order for that argument to be truly sound, Cultural must have been able to pay the $100,000 without the extension of additional credit. Although this creates a question of fact, Thomson has not proved any of the other elements of fraud under Puerto Rico law, so we need not answer that question.

### d. Intent to defraud

In order to successfully show fraud, a plaintiff must prove that the defendant misrepresented material facts *with the intent to defraud*. We hold that Thomson has failed to meet this burden.

■ Even if we were to concede the application of Section 267 of the Penal Code of Puerto Rico (33 L.P.R.A. § 4554) and find that Cultural's nonpayment of insufficient funds checks constituted a prima facie case of an intent to defraud, we believe that Cultural's tender of the August 9 cashier's check rebuts that case. We find the August 9 payment to be sufficient evidence of Schwarz–Nin's good faith attempts to have Cultural repay its debt to dispel any implication of intent to defraud. The fact that Cultural was unable to repay its debt, by itself, should not imply an intent to defraud. Often in business, debtors can not pay creditors. A cause of action may lie with the creditors on the debt, but not necessarily an action for fraud. Over the period during which the defendant allegedly conducted his fraudulent scheme, Cultural actually reduced its debt to Thomson. While this, by itself, does not guarantee that Schwarz–Nin did not defraud Thomson, we find it sufficient to cast serious doubt on any showing by Thomson of an intent to defraud.

■ Additionally, we find that Thomson has not attempted to show that Schwarz–Nin intended to defraud by any proof other than the mere fact of the insufficient funds checks. In general, in order to prove an intent to

defraud, a plaintiff must show either that the defendant intended to receive a benefit or intended to cause actual or potential loss to the plaintiff. *See United States v. Ross,* 77 F.3d 1525, 1543 (7th Cir.1996); *c.f. United States v. Salerno,* 902 F.2d 1429, 1432–1433 (9th Cir.1990) (to prove intent to defraud in a tax filing case, the government must show that defendants engaged in scheme for their own benefit and with a specific intent to interfere with the IRS's collection of taxes); *c.f. Geiger v. The Solomon–Page Group, Ltd.,* 933 F.Supp. 1180, 1190 (S.D.N.Y.1996) (in a securities fraud case, the plaintiff failed to allege intent to defraud when he failed to show any manner in which the conduct could have benefitted the defendant). Indeed, we can see no reason in this case for Schwarz–Nin to defraud Thomson if he did not plan on benefitting from that fraud—it just would not make sense for a reasonable business person to engage in fraud without purpose. Thomson could make a colorable argument that Schwarz–Nin did benefit, through Cultural, from the additional credit. It is certainly true the additional credit helped Cultural—it allowed Cultural to continue doing business in difficult times. However, Thomson has not shown that Schwarz–Nin sought, through the tender of insufficient funds checks, to obtain that additional credit. As stated above, Thomson points to no expression by Schwarz–Nin that the checks should serve as a basis for additional credit. It seems clear that Cultural informed Thomson very frankly that their account held insufficient funds to cover those checks as of the date the checks were tendered. That is why the checks were post-dated. We think it unlikely that Schwarz–Nin intended Thomson would accept those post-dated checks as security for additional credit. The Court believes that, in order to show intent, Thomson would have to more closely connect the act of delivering those checks to a desire on the defendant's part to obtain additional credit for Cultural thereby. It has failed to do so. Therefore, the Court finds that Thomson has not met its burden of showing intent to defraud.

### 5. Conclusion

In order to win on its first claim by summary judgment, Thomson had to persuade the Court to pierce the corporate veil. In order to do this, Thomson had to prove that Schwarz–Nin acted, in his capacity as president of Cultural, to defraud Thomson. Under Puerto Rico law, fraud embodies four elements: (1) Schwarz–Nin made a false statement or misrepresentation; (2) Thomson reasonably relied on that statement; (3) Thomson was injured by its reasonable reliance; and (4) the defendant intended to defraud Thomson. We hold that Thomson has not sufficiently proven any one of these elements. We find that, on the undisputed facts, Schwarz–Nin did not make any false statements or misrepresentations. Furthermore, the Court concludes that Thomson did not reasonably rely on the post-dated insufficient funds checks as a basis for extending additional credit to Cultural. Finally, the Court holds that Schwarz–Nin did not intend to defraud Thomson.

### B. 14 L.P.R.A. § 1404

Section 1404 of the General Law of Corporations provides that:

"If the directors or officers of any corporation organized under the laws of the Commonwealth, shall knowingly cause to be published or give out any written statement or report of the condition or business of the corporation that is false in any material respect, the officers and directors causing such report or statement to be published, or given out, or assenting thereto, shall be jointly and severally, individually liable for any loss or damage resulting therefrom."

Thomson alleges that Schwarz–Nin caused several financial statements to be published, upon which Thomson based its decisions to extend credit to Cultural, which in turn led to Thomson's injury. Under section 1404, Thomson argues, Schwarz–Nin should be liable for that loss. Specifically, Thomson alleges that several financial statements filed by Cultural with its domestic corporations reports of 1989 and 1990 (Plaintiff's Exhibits 23, 25, and 26), as well as two letters from the defendant (Plaintiff's Exhibits 10 and 11) contained false information regarding Cultural's financial condition and induced Thomson to extend credit to Cultural that it otherwise

would not have. The language of the statute presents four elements: (1) publication or disbursement of information regarding the condition or business of the corporation, in writing; (2) falsity; (3) intent; and (4) injury.

■ We can dispose of the letters in short order. The first letter, dated April 17, 1991, responds to a letter sent by Thomson regarding a bounced check. The letter in question states that:

"[Cultural] relies on the bank disbursement in order to cash the [checks; Cultural has been] in contact with the bank, but there are still some final arrangements to be done by their lawyers. As soon as we have an answer, we'll contact you."

Under the statute, this letter is clearly a writing, but the facts do not support a finding that any of the other elements exist. First, the letter does not make any express statement about the condition or business of Cultural. Second, Thomson has not even alleged, let alone proved, that anything in the letter was false. Finally, without delving into the question of intent, Thomson has not explained exactly how the letter injured it, in any but the most general of terms. This letter cannot constitute a violation of 14 L.P.R.A. § 1404.

■ The second letter from Cultural, dated August 9, 1991, states:

"It's is [sic] not to justify ourselves, but to inform you that all our deposits go against our credit line and then are transferred to the operating account as needed. Apparently, there has been a time misunderstanding that caused the problem. You can either redeposit the check or ask for a wire transfer, as you wish."

Again, this is clearly a writing. But as with the first letter, it simply does not speak to the condition or business of the corporation. It makes no express representation that there are funds in Cultural's account (although such an inference might be drawn). It certainly contains no proven falsity. And, as with the first letter, Thomson has not shown how this letter caused it any injury. This letter also does not constitute a violation of 14 L.P.R.A. § 1404.

■ We can now turn to the financial statements that Cultural filed with its domestic corporation reports in 1989 and 1990. Again, these are writings which Schwarz–Nin caused to be published, and they definitely relate to Cultural's business and condition. With respect to these reports, Thomson alleges that the inventory is improperly valued therein, due to obsolescence. Whether the value of Cultural's inventory was properly stated in the financial report is unclear. Thomson merely states that Cultural was forced to take a write-down "later on." Thomson has brought no facts in front of the Court explaining why, at the time the reports were made, Cultural's inventory should not have been valued as it was. However, because Cultural has not debated the issue, we assume that Cultural's inventories were overvalued in the 1989 and 1990 financial statements.

Thomson has nonetheless failed to prove either that the falsity was intended or that Thomson relied on the incorrect inventory value in extending credit to Cultural, and we are compelled by the facts to find otherwise. First, with respect to Schwarz–Nin's intent, Cultural's 1989 and 1990 financial statements were prepared by respected outside auditors, the accounting firm of Coopers & Lybrand. The auditors certified that the reports were prepared in accordance with generally accepted accounting principles, and that they fairly presented Cultural's financial position as of April 5, 1989 and April 30, 1990, respectively. The fact that Schwarz–Nin hired Coopers & Lybrand to conduct audits and prepare financial statements lends credence to his plea of innocent reliance. We fail to see, and Thomson has failed to point out, any evidence showing that Schwarz–Nin impeded Coopers & Lybrand's thorough investigation of Cultural's business. Moreover, we are certainly not prepared to find that Schwarz–Nin and Coopers & Lybrand were in league in an attempt to overvalue Cultural's inventory. Therefore, we have to assume that Schwarz–Nin relied on the accuracy of Coopers & Lybrand's work when he submitted their audits with Cultural's corporation report. We find such good faith reliance to be reasonable, or at most negligent, and not

indicative of the intent to publish false information that section 1404's language requires.

Section 1404 of the General Law of Corporations imposes liability only for damage done by the publication. Thomson has failed to prove that the false financial statements caused it injury. Thomson simply argues that it "could only rely on Cultural's overvalued assets when they extended credit to Cultural in 1989, and particularly in 1990." The Court finds two reasons that this mere statement provides insufficient grounds on which to pin judgment for Thomson. First, Thomson has simply failed to state with sufficient precision how the false reports injured it. Certainly, Cultural's unpaid debt qualifies as injury, but Thomson must show a more direct connection between the alleged falsity of Cultural's financial statements and that debt. A mere statement that Thomson "could only rely on" those financials is conclusory and inadequate. As with its claim of fraud, Thomson has again failed to break down the injury with enough particularity. The write-down that Schwarz–Nin allegedly failed to correctly represent took place in 1989, and the financial statement that forms the basis of Thomson's claim was published on April, 30 1990. At the very least, the Court fails to see how any debt incurred prior to April 30, 1990 can be attributed to Schwarz–Nin under 14 L.P.R.A. § 1404.

More importantly, the Court simply can not believe that Thomson based its decision to extend credit to Cultural on the excess value of Cultural's inventory. Thomson alleges that a write-down of $1.6 million that should have been reflected in the 1990 financial statement caused it to extend the money they now seek to recover. First, it is difficult to believe that Thomson would not have extended credit to Cultural, in the range of $100,000, had Cultural's financial statements accurately reflected Cultural's inventory to be worth $6.3 million instead of $7.9 million. Second, Thomson's subsequent dealings with Cultural do not support Thomson's argument. For Cultural's fiscal year ending in April 1991, Cultural took a write-down of $3 million (on top of the previous write-down)—a much more significant indication of Cultural's financial difficulties. This later write-down left Cultural's inventory valued at approximately $3 million. The record shows, however, that Thomson continued to extend credit to Cultural (allegedly based on post-dated checks). How is the Court to believe that Thomson would have acted differently during the 1990 fiscal year if Cultural had disclosed a 20% write-down on a $7 million inventory, when Thomson continued to extend credit to Cultural after a 50% write-down on a $5 million inventory? Plainly, we cannot.

In conclusion, the Court finds that Thomson has not met its burden of establishing either a violation of 14 L.P.R.A. § 1404 or an injury resulting therefrom. Therefore, the Court also denies Thomson's second claim. Judgment will be entered accordingly.

IT IS SO ORDERED.