In re JACKSON BROOK INSTITUTE,
INC., Debtor.

BANCBOSTON REAL ESTATE CAPI-
TAL CORPORATION, Plaintiff and
Defendant-in-Counterclaim

v.

JBI ASSOCIATES LIMITED PARTNER-
SHIP, Defendant and Plaintiff-in-
Counterclaim

and

Jackson Brook Institute, Inc., Running
Hill Associates, L.P., Design Acoustics,
Inc. Behavioral Medical Care, Parties-
in-Interest

Bankruptcy No. 98–20439
Adversary No. 98–2060.

United States Bankruptcy Court,
D. Maine.

Oct. 20, 1998.

Robert J. Keach, Bernstein, Shur, Sawyer & Nelson, Portland, ME, for Plaintiff.

Daniel L. Cummings, Norman, Hanson & DeTroy, Portland, ME, John L. Whitlock, Palmer & Dodge, LLP, Boston, MA, for Defendant.

Roger A. Clement, Jr., Verrill & Dana, Portland, ME, for Jackson Brown Institute, Inc.

John C. Walker, Windham, ME, for Running Hill Associates, L.P.

## MEMORANDUM AND DECISION

JAMES A. GOODMAN, Bankruptcy Judge.

This Court heard on September 15, 1998 the following contested matters in the above captioned adversary proceeding: (1) Bank Boston's Motion to Dismiss the Counterclaim and Strike the Affirmative Defenses of the Defendant, JBI Associates Limited Partnership; (2) Bank Boston's Motion for Summary Judgment; and (3) Bank Boston's Motion for Sanctions against JBI Associates Limited Partnership under Me. R. Civ. P. 11. For the reasons discussed below, the Court grants the Motion to Dismiss JBI Associates' Counterclaim, strikes JBI Associates' Affirmative Defenses, grants BancBoston's Motion for Summary Judgment, and the request for sanctions is denied without prejudice.

## BACKGROUND

Understanding the identity and roles of the parties is essential to the issues at bench, so I begin with the roster of players:

**Running Hill Associates Limited Partnership** ("Running Hill") is a Massachusetts Limited Partnership which owns the fee interest in land on Running Hill Road in South Portland, Maine ("the Premises").

**JBI Associates Limited Partnership** ("Associates") is a Massachusetts Limited Partnership that leases the Premises owned by Running Hill under a ground lease. Associates developed the Premises into an acute care psychiatric hospital.

**Jackson Brook Institute, Inc.** ("Institute") is a Maine Corporation and the Debtor in these proceedings. Institute leases the Premises and buildings of the psychiatric hospital from Associates under a sublease and operates the hospital under the name Jackson Brook Institute. Institute also claims a 32% limited partnership interest in Associates. While it is not clear, Associates appears to be denying such an interest.[1]

**Community Care Systems, Inc.** ("CCSI") is a Massachusetts Corporation which is the parent corporation of the Institute and owns 100% of the Institute stock. In 1982 when the premises was being developed, CCSI was a general partner of Associates.

**Frederick Thacher** is the president of CCSI and during some of the relevant times, the president of the Institute. He is also the sole general partner of Running Hill and the majority shareholder of CCSI.

**Robert Cserr** is a general partner of Associates and a shareholder in CCSI.

**Elia Lipton** alleges that he is a General Partner of Associates. Cserr disputes Lipton's status as a general partner and this matter is being litigated in Massachusetts. Lipton is also a shareholder in CCSI.

**Casco Bank and Trust Company** ("Casco") is the financial institution that provided the original financing to construct the psychiatric hospital.

**Casco Northern Bank, N.A.** ("Casco Northern") is the successor in interest to Casco.

**BancBoston Real Estate Capital Corporation** ("BancBoston") is the assignee of Casco Northern's interest in the Note, Mortgage, Collateral Assignment of Leases, and other documents relating to the original financing of the psychiatric hospital by Casco.

CCSI develops health care facilities and in 1979 it proposed to build the Jackson Brook Institute, a psychiatric hospital in South Portland, Maine. The plan was to create two new entities: Associates, which would obtain the financing to construct the facility; and Institute, an entity that would lease the facility from Associates and run the hospital.[2] Associates was formed as a limited partnership with CCSI as one of its general partners. Institute was created as the wholly owned corporate subsidiary of CCSI. Thacher controlled all three entities and was authorized to contract on their behalf.[3]

In 1982, Casco negotiated with CCSI, Associates, and Institute all through Thacher, to provide $5.6 million in construction financing to build the hospital. Thacher executed the Commitment Letter which stated *inter alia* that:

No funds from Jackson Brook Institute, Inc., or JBI Associates shall be withdrawn for the benefit of any affiliated business entities in any form without the prior written consent of Casco Bank and Trust Company. Withdrawals shall include but not limited to management fees, dividends, loans and rental payments.

December 20, 1982 Commitment Letter, p.3, ¶ 6. On January 27, 1983, Thacher acting on behalf of the Institute, Associates and CCSI

---

1. Associates does not deny the existence of this interest nor does it agree that the Institute has such an interest.

2. The fee simple interest in the real estate has at all times remained in Running Hill. On May 5, 1983 Associates entered into a ground lease with Running Hill. On the same date, Associates in turn subleased the land to Institute.

3. As set forth above, Thacher is also the sole general partner of Running Hill, the entity that owns the Premises where the hospital was built.

executed a clarification to the Commitment Letter with Casco stating that the prohibition against the up-streaming of funds quoted above is intended to control withdrawal of funds from Institute and Associates once the hospital is operational.

In May 1983, Associates entered into a "Lease and Sublease Agreement" for the land and yet-to-be built hospital with Institute. CCSI guaranteed Institute's obligations under the lease. In 1999, Institute is required under the terms of the lease to tender to Associates an offer to purchase the leased premises for $10 million or its fair market value, whichever is greater.[4] On May 11, 1983, Casco funded the $5.6 million loan to Associates, who in turn with Running Hill granted a mortgage and security interest in the hospital to Casco. Associates also assigned the lease and CCSI's guaranty to Casco. All documents were executed by Thacher in his capacity as president of CCSI, which was at the time a general partner of Associates, and as a general partner of Running Hill. On May 12, 1983, Associates and Institute executed an amendment to the December Commitment Letter whereby Institute, Associates and CCSI expressly agreed to be bound by the terms of the Commitment Letter. On February 16, 1995, Casco Northern assigned all of its rights and interest in the Note, Mortgage and security agreements to BancBoston.

## THE LITIGATION

### (A) The 1993 Up-streaming Action:

Things proceeded smoothly until sometime in 1993 when Casco discovered that Institute was up-streaming funds to its parent CCSI, in violation of the December Commitment Letter. On November 24, 1993, Casco Northern filed suit in the Maine Superior

Court against Associates, Institute, and CCSI seeking injunctive and declaratory relief including enforcement of the up-streaming prohibition contained in the Commitment Letter. Casco Northern alleged in the Complaint that sometime prior to June 1993, Institute up-streamed upwards of $3 million to CCSI without Casco's consent, and there remained due and owing to Institute in excess of $800,000. Institute answered the Complaint and denied that it was bound by the up-streaming prohibition contained in the December Commitment Letter. Associates filed a crossclaim against Institute and filed a motion requesting injunctive relief that mirrored Casco Northern's request.[5]

The First major incident in the litigation occurred on May 25, 1994, when Institute moved to disqualify Associates' legal counsel because that counsel had previously represented the Institute in various related matters. The litigation stalled pending a decision on the disqualification motion, which was granted on February 1, 1995. Associates appealed the disqualification order to the Maine Law Court and on February 14, 1995, it sought a stay of the Up-streaming Litigation pending the appeal. On February 17, 1995, the Superior Court granted Associates' request for a stay.

On November 30, 1995, the Law Court affirmed the disqualification order and, thereafter, Associates sought and obtained seven additional extensions of the stay of the litigation. *See* BancBoston's Memorandum in Support of Motion to Dismiss Counter Claims and Strike Affirmative Defenses, Exhibits 9–22. The litigation was effectively stayed for almost three years until December 8, 1997. In each request for a stay, Associates claimed that the stay was necessary to ongoing settlement discussions and should negotiations break down, it would need the

---

4. Because Associates is merely a lessee under the Ground Lease with Running Hill, it seems odd that it could convey the fee interest to Institute. However under the Ground Lease, Associates is also required to make a mandatory offer to purchase the Premises from Running Hill in 1999. *See* Ground Lease Agreement p. 14, ¶ 17(b). The Ground Lease also provides that if Associates accepts the mandatory offer from Institute under its Sublease, Running Hill will in turn accept Associates offer to purchase subject only to com-

pletion of the purchase by Institute under the Sublease. *See* Ground Lease Agreement, pp. 14–15, ¶ 17(b).

5. The bulk of Associates' defense of foreclosure is the alleged failure of BancBoston to pursue the Up-streaming Litigation. Curiously, Associates' crossclaim and request for injunctive relief in that litigation sought the same relief as BancBoston and was not pursued by Associates.

additional time to prepare its new counsel for litigation. Remarkably, on October 14, 1997, prior to the expiration of the seventh and final stay granted by the Superior Court, Associates' new counsel withdrew from the case. *See* Defendant's Statement of Material Facts in Dispute, Exhibit 6, Docket Sheet.

### (B) BancBoston's Foreclosure Action:

On October 29, 1997, BancBoston filed a Complaint for Foreclosure against Running Hill, Associates, Institute, and other interested parties in Maine Superior Court. The Complaint alleges that Associates defaulted on its obligations to the bank by: (1) failing to make the required monthly payment due and owing on August 1, 1997; (2) failing to make timely payments under the note including the months of June, July, and August 1997; (3) failing to timely pay interest and late charges under the note; (4) failing to pay real estate taxes due and payable before August 21, 1997; (5) failing to provide financial statements as required; and (6) failing to obtain BancBoston's written consent before transferring partnership interests or admitting additional partners into Associates.

Associates filed its Answer setting forth four affirmative defenses, along with a four count Counterclaim. All of the affirmative defenses and each count of the counterclaim, except one, depend upon the same factual basis. Associates alleges that Casco, and subsequently BancBoston did not aggressively pursue the Up-streaming Litigation. As a consequence, Institute diverted funds to CCSI during the litigation thereby leaving Institute with too little cash to pay rent to Associates under the lease. Based on this premise, Associates states as affirmative defenses that BancBoston is: (1) estopped from foreclosing its mortgage; (2) barred from foreclosing due to BancBoston's breach of its contractual duties of good faith and fair dealing; (3) barred from foreclosing due to Banc-Boston's breach of its fiduciary duties owed to Associates; and (4) liable to Associates for the Institute's lease obligations, and is barred from taking advantage of the defaults under the Note and Mortgage.

Based upon the same premise that Banc-Boston failed to aggressively pursue the Up-streaming Litigation, Associates counterclaims that BancBoston: (1) breached its contractual duty of good faith and fair dealing; (2) breached a fiduciary duty owed to Associates; and (3) became a principal liable for rent and other obligations owed by Institute to Associates. Based upon BancBoston's actions, Associates claims that Banc-Boston is estopped from taking advantage of the Institute's default and accelerating Associates' payment obligations under the Note.

The last remaining counterclaim is premised upon BancBoston's intervention into Associates' litigation against Institute, CCSI, and Thacher, which is discussed in further detail below. Essentially, Associates alleges that BancBoston's intervention was done for the sole purpose of interfering with Associates' ability to prosecute the litigation, thereby breaching a duty owed to Associates. While not clear from the papers, Associates' counsel clarified in argument that it merely seeks damages by way of this count.

### (C) Associates' Law Suit:

In November 1997, shortly after BancBoston commenced foreclosure proceedings, Associates filed suit in Maine Superior Court against Institute, CCSI, and Thacher seeking *inter alia* to collect past due rents owed by Institute, recover the funds up-streamed from Institute to CCSI as a fraudulent conveyance, and appoint a receiver for Institute pending its dissolution. In its Complaint, Associates admits that it was in default of its obligation to BancBoston under the Casco note and mortgage. *See* BancBoston's Memorandum in Support of Motion to Dismiss Counter Claims and Strike Affirmative Defenses, Exhibit 23, Complaint, p. 7 ¶ 22, p. 9 ¶ 33. Additionally, in other papers filed in the litigation, Associates acknowledged that BancBoston was free to proceed against Associates for a money judgment that was enforceable through foreclosure. *See* BancBoston's Memorandum in Support of Motion to Dismiss Counter Claims and Strike Affirmative Defenses, Exhibit 24, Memorandum in Support of Motion for Attachment, pp. 7–8.

BancBoston moved to intervene in the litigation because it had exercised its rights under the Assignment of Leases between

Associates and Institute, and it was the entity that was entitled to sue on the lease. The Superior Court granted BancBoston's request to intervene. The Court also denied Associates' pending motions to appoint a receiver for Institute and obtain a pre-judgment attachment, finding *inter alia* that BancBoston may be the real party in interest to enforce the rights under the lease and not Associates. *See* BancBoston's Memorandum in Support of Motion to Dismiss Counter Claims and Strike Affirmative Defenses, Exhibit 25, Decision and Orders on Pending Motions.

### (D) The Bankruptcy:

On March 27, 1998, Institute filed a voluntary petition under Chapter 11. On April 9, 1998, I ordered Institute to pay rents directly to BancBoston and on May 22, 1998, I granted BancBoston's unopposed Motion for Relief from Stay to continue the State Court foreclosure litigation. On or about June 8, 1998, pursuant to Fed. R. Bankr.P. 9024, Institute filed a notice of removal of the BancBoston foreclosure litigation to this Court. BancBoston concurred in the removal and filed a statement indicating that the matter was a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (N), and (O). Associates objected to this Court's jurisdiction and filed a Motion asking this Court to Abstain or in the Alternative to Remand. I heard the matter on July 15, 1998, and found that this Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and that this matter is a core proceeding under 28 U.S.C. § 157(b)(2). That Order is on appeal before the United States District Court and no stay pending appeal has been requested or issued.

Prior to removal, BancBoston filed the following motions in the foreclosure litigation:

(1) Motion to Dismiss the Counterclaim and Strike the Affirmative Defenses of Associates; (2) Motion for Summary Judgment; and (3) Motion for Sanctions against Associates, under Me. R. Civ. P. 11. Associates responded to all of these motions and on September 15, 1998, I heard oral argument. They are now ripe for disposition.

### *DISCUSSION*

■ Prior to addressing the merits of the pending motions, I believe a recapitulation of this Court's jurisdiction over this removed action is in order given the import of this litigation on the pending reorganization.

■ Removal is governed by 28 U.S.C. § 1452(a), which states: "A party may remove any claim or cause of action in a civil action... to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." Section 1334(b) determines jurisdiction and provides that: "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 [6], or arising in [7] or related to cases [8] under title 11." Pursuant to 28 U.S.C. § 157(a) the District Court may refer bankruptcy jurisdiction to the bankruptcy court and by its Order dated August 1, 1984, the United States District Court for the District of Maine has completely executed its Section 157(a) reference authority. *See Goldstein v. Marine Midland Bank, N.A.* (*In re Goldstein* ), 201 B.R. 1, 4 (Bankr.D.Me.1996). Once jurisdiction is found, 28 U.S.C. § 157 is examined to determine the extent to which a bankruptcy court may adjudicate the matter which depends upon whether the matter is classified

**6.** Proceedings "arising under" title 11 involve a " 'cause of action created or determined by a statutory provision of the Bankruptcy Code' ". *Goldstein v. Marine Midland Bank, N.A.* (*In re Goldstein*), 201 B.R. 1, 4 (Bankr.D.Me.1996) (*quoting* Norton Bankruptcy Law and Practice 2d § 4:38 at 4–230).

**7.** Proceedings "arising in" a case under title 11 involve " 'those that are not based on any right expressly created by Title 11, but nevertheless, would have no existence outside of the bankruptcy.' " Norton Bankruptcy Law and Practice 2d

§ 4:30 at 4–231 (quoting *Wood v. Wood* (*In re Wood* ), 825 F.2d 90 at 96–97 (5th Cir.1987)); *see also Goldstein,* 201 B.R. at 4.

**8.** "Related to" jurisdiction is the broadest component of Section 1334(b) and "extends to matters 'concerned only with State law issues that did not arise in the core bankruptcy function of adjusting debtor-creditor rights.' " *Boyajian v. DeLuca* (*In re Remington Dev. Group, Inc.*), 180 B.R. 365, 368 (Bankr.D.R.I.1995)(*quoting In re Arnold Print Works, Inc.,* 815 F.2d 165, 167 (1st Cir.1987)).

as core or non-core. *FDIC v. Majestic Energy Corp. (In re Majestic Energy Corp.)*, 835 F.2d 87, 90 (5th Cir.1988); *Goldstein,* 201 B.R. at 6–7.

In this case, the primary assets of this estate are: the Institute's lease of the Hospital with Associates; the Institute's potential 32% limited partnership interest in Associates; and the Institute's mandatory option under the lease to purchase the full fee interest in the Hospital in 1999. Institute has defaulted under the lease pre-petition. BancBoston claims to have stepped into the shoes of Associates under the lease based upon the assignment, and through its Foreclosure Complaint, it asks the Court to determine that its mortgage interest has priority over any other interest in the Hospital. BancBoston also asks that the court "[d]etermine the order of priority of such other parties as may appear, together with amounts due such parties, if any."

Under the Non–Disturbance, Attornment and Subordination Agreement ("Subordination Agreement") dated May 11, 1983, if the Institute is not in terminable default under the terms of the Lease, in the event of foreclosure, BancBoston agrees that the "Lease and the rights of Lessee [Institute] thereunder shall not be disturbed except in accordance with the term of said Lease and any foreclosure sale shall be made subject to said Lease." Subordination Agreement at ¶ 2. The Institute, under Title 11, has the ability to cure its defaults under the lease and assume the lease, thereby directly affecting the priority of interests in the Hospital property. *See* 11 U.S.C. § 365. Allowing the foreclosure litigation to proceed in State Court separate and apart from the bankruptcy proceeding would strip the Institute of its ability to reorganize and of the rights granted to it under Title 11. The Institutes' Section 365 rights vest upon the bankruptcy filing and allow the Institute to enforce the terms of the Subordination Agreement. I conclude, therefore, that this is a matter arising under title 11, and that this is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N), and (O). *See Citicorp Sav. v. Chapman (In re Chapman)*, 132 B.R. 153, 157 (Bankr.N.D.Ill.1991)(Finding re-

moved foreclosure proceeding against property of the estate to be a core matter because, *inter alia,* the property was a major asset of the estate and foreclosure would have a significant impact on reorganization); *In re Hunt Energy Co., Inc.,* 1988 U.S. Dist. LEXIS 14295, *27–28 (D.Ohio 1988)(Adversary proceeding commenced to sell debtor's principal asset and determine priorities was a proceeding arising under Title 11); *In re Dogpatch U.S.A., Inc.,* 810 F.2d 782, 785–86 (8th Cir.1987)(Finding that a contract and guaranty given by third parties were such an integral part of reorganization that subsequent litigation on the contract and guaranty constituted a core proceeding).

## I. Motion to Dismiss Counterclaims and Strike Affirmative Defenses:

 The Motion to Dismiss the Associates' counterclaims is governed by Fed.R.Civ.P. 12(b)(6) which states:

> Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: ... (6) failure to state a claim upon which relief can be granted.

*See also* Fed. R. Bankr.P. 7012(b). Upon reviewing a motion to dismiss, it is well established that the court "must take the allegations in the complaint as true," *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir.1993), and that "the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Furthermore, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted).

 A motion to strike affirmative defenses falls within the realm of Fed.R.Civ.P. 12(f) which states: "Upon motion made by a party ... the court may order stricken from any pleading any insufficient defense...."

*See also* Fed. R. Bankr.P. 7012(b). Motions to strike defenses are generally disfavored and the court may "strike only those defenses so legally insufficient that it is 'beyond cavil that the defendants could not prevail on them.'" *Coolidge v. Judith Gap Lumber Co.,* 808 F.Supp. 889, 893 (D.Me.1992) (*quoting U.S. v. Kramer,* 757 F.Supp. 397, 409–10 (D.N.J.1991)). "Courts grant motions to strike a defense 'only if the defense is legally insufficient, and presents no question of law or fact that the court must resolve.'" *Nelson v. University of Maine System,* 914 F.Supp. 643, 647 (D.Me.1996)(*quoting* 2A Moore's Federal Practice, P 12.21[3] at 112–210).

### (A) No Factual Basis Exists for Affirmative Defenses and Counts 1–3 of Associates' Counterclaim:

Counts 1–3 of Associates' Counterclaims and all of its affirmative defenses are based upon the faulty assumption that BancBoston failed to aggressively pursue the 1993 Up–Streaming Litigation against the Institute. Associates states that BancBoston delayed the litigation with the knowledge that funds were being up-streamed to CCSI, thereby leaving the Institute with insufficient cash to pay its rent to Associates. This in turn left Associates without funds to service BancBoston's Note.

It is admitted and it is without contradiction that Associates caused the majority of delays in the Up-streaming Litigation. Initially, Associates sought a stay pending the appeal of the order disqualifying its counsel. This stay lasted 10 months. Associates then sought and obtained seven separate extensions of the stay, effectively staying the litigation until December 8, 1997, an additional two years. In each motion, Associates alleged ongoing settlement discussions and the need to educate new counsel should the discussions break down. To add insult to injury, Associates' new counsel withdrew on October 14, 1997, two months after obtaining its final stay and one and one-half months before the stay expired. Clearly, it was not Casco or BancBoston that caused the delay but Associates.

When confronted with the unrefuted travel of the Up-streaming Litigation, Associates responds that its delay was justified because Casco delayed initially in the litigation. Such an argument is ludicrous and is unsupported by the record in the Up-streaming Litigation.

Associates was the beneficiary of the stays it sought in the Up-streaming Litigation. We agree with BancBoston that Associates is now judicially estopped from asserting a contrary legal position in this matter. *See Patriot Cinemas, Inc. v. General Cinema Corp.,* 834 F.2d 208, 212 (1987)("where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has·acquiesced in the position formerly taken by him")(*citing Davis v. Wakelee,* 156 U.S. 680, 689, 15 S.Ct. 555, 39 L.Ed. 578 (1895)); *Chrysler Corp. v. Silva,* 118 F.3d 56, 59–60 (1st Cir.1997) (Counterclaim denied where factual basis for counterclaim was contradicted by earlier submissions and pre-trial evidence presented by the same party). Associates cannot now be heard to complain about delays in the Up-streaming Litigation that it occasioned, and that it acknowledged were beneficial and necessary when obtained.[9] To allow Associates to assert a contrary position here would provide them with an unfair advantage and sanction Associates' gamesmanship in judicial proceedings. *See Patriot Cinemas,* 834 F.2d at 212. Accordingly, because there is no factual basis for Counts 1–3 of the Counterclaim and the Affirmative Defenses presented by Associates, I find that Counts 1–3 of the Counterclaim fail to state a claim upon which relief can be granted and the Affirmative Defenses pleaded are legally insufficient. I GRANT BancBoston's Motion to Strike the Affirmative Defenses and BancBoston's Motion to Dismiss Counts 1–3 of the Counterclaim.

---

9. Again, it is interesting to note that Associates argues it was an intended beneficiary under the agreement prohibiting the up-streaming of funds, yet it did not pursue any remedy when the agreement was broken. It did just the opposite by delaying the litigation.

**(B) No Legal Basis Exists for Affirmative Defenses and Counts 1–4 of Associates' Counterclaim**

In addition to my holding above, I find that there is no legal basis for the Counterclaim or the Affirmative Defenses set forth in Associates' Answer to the Foreclosure Complaint. Accordingly, for the additional reasons set forth below, I find that the Counterclaims fail to state a claim upon which relief may be granted and the Affirmative Defenses are legally insufficient.

█ Count I of the Counterclaim and Associates' second Affirmative Defense allege that Casco's and later BancBoston's failure to diligently pursue the Up–Streaming Litigation constituted a breach of their "contractual duty of good faith and fair dealing." Because the loan documents, Commitment Letter, and the agreements modifying the Commitment Letter contain no express contractual duty of good faith and fair dealing on the part of the bank, we can only assume that Associates is referring to an implied duty. BancBoston has cited a line of cases which hold that under the Maine version of the Uniform Commercial Code, there is an implied duty of good faith on banks "requiring 'honesty in fact in the conduct or transaction concerned.'" *Diversified Foods, Inc. v. First Nat. Bank*, 605 A.2d 609, 613 (Me. 1992). However, the Law Court has been unwilling to extend the duty on banks beyond its statutory scope to impose a more onerous duty of objective good faith. *See Id.* at 613; *First NH Banks Granite State v. Scarborough*, 615 A.2d 248, 250–51 (Me. 1992); *People's Heritage Sav. Bank v. Recoll Management, Inc.*, 814 F.Supp. 159, 168–70 (D.Me.1993). The Court in *Diversified Foods* did acknowledge that the more onerous standard of good faith can apply to banks in Article 4 of the UCC, but that is "limited to issues of bank deposits and collections." *Id.* Clearly, that Article does not apply to the instant case. BancBoston argues that its relationship with Associates is not governed by the UCC, and even if it were, Associates has not alleged that BancBoston or Casco acted without honesty in fact in pursuing the Up-streaming Litigation.

[10] Associates points to the case *Top of the Track Assoc. v. Lewiston Raceways, Inc.*, 654 A.2d 1293 (Me.1995), for the proposition that implied covenants are recognized in contracts when it is absolutely necessary to effectuate the intent of the parties. It argues that an implied term in Casco's contract with Associates was that Casco would "exercise its best effort—that is, it would attempt in 'good faith'—to limit The Institute's ability to send money 'upstream' to its parent, CCSI." I find that such an expansive duty of good faith is not required under Maine Law between a borrower and a lender and that *Top of the Track* is distinguishable from the instant case.

In *Top of the Track*, an operator of a harness racing facility sought investors to upgrade its concession facilities to attract a larger audience on race dates. 654 A.2d at 1293. Top of the Track Associates ("TOTA") was formed for that purpose and entered into a lease with the Operator. *Id.* at 1294. TOTA renovated the clubhouse specifically to accommodate the patrons of the raceway. Before the start of the new racing season, the Operator, without knowledge to TOTA withdrew its application for race dates with the state commission and subsequently ceased operating the race track. *Id.* TOTA argued that the lease contained an implied covenant that the Operator would operate the race track and apply annually for racing dates until the expiration of the lease. *Id.* The Operator argued that such an implied covenant was prohibited by the integration clause contained in the lease. *Id.* at 1295. The Law Court reversed a grant of summary judgment in favor of the Operator finding that a contract contains not only the promises expressed in words, but also implied provisions that are "'indispensable to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it was made.'" *Id.* (quoting *Sacramento Nav. Co. v. Salz* 273 U.S. 326, 329, 47 S.Ct. 368, 71 L.Ed. 663 (1927)). The Court went on to say that "courts have long recognized an implied covenant in contracts that neither party shall be its unilateral action destroy or injure the right of the other party to receive the fruits or benefits of the contract or render perfor-

mance impossible." *Top of the Track,* 654 A.2d at 1296.

Clearly, *Top of the Track* does not deal with a borrower/lender relationship. With the Law Court's pronouncement in *Diversified Foods* that it would not extend the implied duty of good faith against a bank beyond its statutory scope, we cannot presume that its utter silence on the matter in *Top of the Track* would be tantamount to such an extension. *See also Niedojadlo v. Central Maine Moving & Storage Co.,* 715 A.2d 934, 937 (Me.1998)(In August of this year, the Law Court affirmed that it would not extend the implied covenant of objective good faith beyond its statutory scope contained in the Maine UCC). It appears that Associates' reliance on *Top of the Track* would have been better suited in an action by Associates against the Institute on its lease; however, Associates has not seen fit to pursue such a matter.[10] Assuming that the UCC applies to the lending relationship between BancBoston and Associates, I find that Associates has not alleged any facts that would support a finding that BancBoston or Casco acted without honesty in fact in pursuing the Up-streaming Litigation. Accordingly, on this basis, I dismiss Count I of the Counterclaim and strike the second Affirmative Defense.

■ Count II of the Counterclaim and Associates' third Affirmative Defense allege that BancBoston's and Casco's failure to diligently pursue the Up–Streaming Litigation constitutes a breach of a fiduciary duty owed to Associates. I agree with BancBoston's statement of the law on this issue. The Law Court has consistently held that where there is no confidential relation between the parties giving rise to a fiduciary duty, there can never be a breach of a fiduciary duty. *See Diversified Foods,* 605 A.2d at 614; *Ruebsamen v. Maddocks,* 340 A.2d 31, 36 (Me.1975); *People's Heritage,* 814 F.Supp. at 170 (recognizing "[u]nder Maine law, 'fiduciary' and 'confidential' relations are legal equivalents"). "The salient elements of a confidential relation are the actual placing of trust and confi-

dence in fact by one party in another and a great disparity of position and influence between the parties to the relation." *Ruebsamen,* 340 A.2d at 35. In applying the test to a lender-borrower situation, the First Circuit suggested that a court look for any "concrete facts alleged to show a relationship going beyond the ordinary bank/customer situation." *Reid v. Key Bank,* 821 F.2d 9, 17 (1st Cir.1987). Typical situations involve the lender exercising control over the borrower's day to day operations. *See generally Diversified Foods,* 605 A.2d at 615 (*citing Reid,* 821 F.2d at 17–18).

■ Associates has not even alleged the existence of a confidential relationship, let alone any facts that would tend to show a relationship going beyond the ordinary bank/borrower relationship. "A general allegation of a confidential relation is not a sufficient basis for establishing the existence of one.... The facts constituting the alleged relationship must be set forth with sufficient particularity to enable the court to determine whether, if true, such facts create a fiduciary or confidential relationship." *Ruebsamen,* 340 A.2d at 35 (citations omitted). Accordingly, Count II of the Counterclaim is dismissed and the third Affirmative Defense is stricken.

■ Count III of Associates' Counterclaim alleges that by virtue of Casco's and BancBoston's "acquisition of the power to control The Institute's upstreaming of funds to CCSI, [they] became principals with liability for the institute's obligations to The Partnership under the Lease." Similarly, Associates' fourth Affirmative Defense states that by virtue of the control possessed by BancBoston and Casco over the Institute, specifically the power to prevent the Institute from up-streaming funds to its parent CCSI, BancBoston is liable to Associates for the Institute's obligations under the lease.

BancBoston readily acknowledges that banks have been held liable to borrowers in

---

**10.** Given all the overlapping interests between the parties involved in the Hospital, Associates' status as the Lessor of the Hospital, and the fact the Associates was the primary obligor under the Note and Mortgage to Casco, Associates was in the best position to know of and to prevent the Institute from up-streaming funds to CCSI. It is also apparent that Associates had a lot to lose by the up-streaming of funds and again, why it did not act sooner is beyond comprehension.

situations where the bank exercised complete dominion and control over the affairs of the borrower so as to render the borrower a "mere instrumentality" of the bank. *See e.g. F.C. Imports, Inc. v. First Nat'l Bank*, 816 F.Supp. 78, 91–93 (D.P.R.1993). Here, Institute is not a borrower. Furthermore, the action complained of is BancBoston's *failure* to control the affairs of the Institute. That is opposite of what is required to prove a borrower is the mere instrumentality of the bank. On this basis, I find that there is no legal basis for Count III of the Counterclaim or the fourth Affirmative Defense.

Associates, in its Objection, appears to argue that this claim should be viewed as an agency/fiduciary relationship between Casco and the Institute. To the extent Associates relies on the existence of a fiduciary relationship, we have already disposed of this issue against Associates *supra* and no further discussion is required herein.

■ Count IV of the Counterclaim alleges that when BancBoston sought to exercise its rights under the Collateral Assignment of Leases, collecting rent directly from the Institute and intervening in Associates' 1997 lawsuit against the Institute, it acted for the purpose of harming Associates and not for any other commercially legitimate purpose. Associates states that these actions constituted a breach of BancBoston's duty to Associates.

I have dealt with the issue of the existence of an implied duty *supra* and have resolved that issue against Associates. For the reasons discussed earlier, I find that there is no such implied duty and this Count must also fall because it fails to state a claim upon which relief can be granted. Additionally, under the Assignment of Leases, upon Associates' default under the Note, BancBoston was entitled, *inter alia*, to collect rents directly from the Institute. Associates acknowledged in its litigation against the Institute that it was in default under the Casco Note. BancBoston's actions were within the realm of its contractual remedies. Furthermore, BancBoston's intervention into Associates' Litigation was done in an effort to preserve its contractual remedies and was approved by the State Court. The Court

expressly stated that it was "equally concerned about the claim of BancBoston that, pursuant to the collateral assignment of leases, it, not the partnership [Associates], is the entity entitled to enforce rights under the lease." *See* BancBoston's Memorandum in Support of Motion to Dismiss Counter Claims and Strike Affirmative Defenses, Exhibit 25, Decision and Orders on Pending Motions, pp. 3–4. If BancBoston did not act in the manner it ultimately did, its actions could have been viewed as commercially unreasonable. I find that Count IV is totally lacking in merit.

## II. *Summary Judgment:*

A motion for summary judgment is governed by Fed. R. Bankr.P. 7056 which applies and incorporates Rule 56 of the Federal Rules of Civil Procedure in bankruptcy proceedings. The rule states:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The First Circuit BAP has recently summarized the standard for summary judgment as follows:

> "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour [v. Dynamics Research Corp.]*, 63 F.3d [32] at 37 [(1st Cir.1995), *cert. denied*, 516 U.S. 1113, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996) ] (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favor-

ing the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers,* 902 F.2d at 143 (*quoting Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511) (citations and footnote in *Anderson* omitted). We "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour,* 63 F.3d at 36. *Borschow Hosp. and Medical Supplies, Inc. v. Cesar Castillo Inc.,* 96 F.3d 10, 14 (1st Cir.1996). In summary judgment parlance, a dispute is "genuine" if "'the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.'" *Rivera–Muriente v. Agosto–Alicea,* 959 F.2d 349, 352 (1st Cir.1992) (*quoting United States v. One Parcel of Real Property, Etc.,* 960 F.2d 200, 204 (1st Cir.1992)). "A fact is material if it 'carries with it the potential to affect the outcome of the suit under the applicable law.'" *One National Bank v. Antonellis,* 80 F.3d 606, 608 (1st Cir.1996) (*quoting Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir. 1993)). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). Thus, the substantive law defines which facts are material. *Id.* at 248, 106 S.Ct. at 2510. *Sanchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir.1996).

*Weiss v. Blue Cross/Blue Shield,* 206 B.R. 622, 624 (1st Cir. BAP 1997).

In support of its Motion for Summary Judgment, BancBoston attaches the Verified Complaint filed by Associates in its 1997 litigation against the Institute and the Affidavit of Christopher Smith, a vice president at BancBoston, N.A., the parent company of BancBoston.[11] In support of its Motion, the Bank argues that Associates' statement in its Complaint that Associates "has been unable to fulfill its obligations to BancBoston," constitutes an admission that it is in default of its obligations under the Note. That admission, argues BancBoston, coupled with the

Smith Affidavit setting forth the terms of the Note and security agreements, the specific defaults, and the balances due under the Note, is sufficient to enter summary judgment on its Foreclosure Complaint.

Associates filed an Objection without supporting affidavits and relies primarily on the same arguments set forth in support of its Counterclaim and Affirmative Defenses. Because these issues have been resolved against Associates, I will not address them any further herein. Additionally, Associates argues that: (1) a genuine issue of material fact exists as to whether Associates' failure to provide financial statements is a material breach under the Mortgage. In that vein it argues that the Court should not allow the bank to foreclose because of mere technical defaults; (2) a genuine issue of material fact exists as to whether there have been any material transfers of interests in Associates; (3) a genuine issue of material fact exists as to whether BancBoston waived the foreclosure under M.R.S.A. § 6204 by accepting payments from the Institute; and (4) a genuine issue of material fact exists as to whether the attorney fees and expenses claimed by BancBoston are reasonable.

While I agree with Associates that disputed facts exist as to whether there were material transfers of interests in Associates and whether technical defaults occurred under the Note and Mortgage, these issues are not material to resolution of the legal issue presented. BancBoston alleges in its Complaint that a payment default occurred on August 1, 1997. *See* Foreclosure Complaint ¶ 12(a), p. 3. This allegation is supported by the unrefuted Smith Affidavit and by Associates' own admission in the Complaint it filed in 1997, stating that it has been unable to fulfill its obligations to BancBoston. *See* Smith Affidavit at ¶ 9(a), p.3; *See* BancBoston's Memorandum in Support of Summary Judgment, Exhibit A, Complaint, p. 7 ¶ 22, p. 9 ¶ 33. Even if Associates made a general denial that it was not in payment default, which it did not, such a denial would not be sufficient

---

11. BancBoston also includes an affidavit from its attorney, Robert Keach, indicating that as of

March 9, 1998, the bank incurred fees totaling $24,276 and disbursements of $4,079.

to overcome BancBoston's request for summary judgment. *See* Fed.R.Civ.P. 56(e).[12]

■ The strongest argument made by Associates is that under 14 M.R.S.A. § 6204, BancBoston may have waived the foreclosure by accepting payment from Institute. Upon further investigation, however, this argument is equally fallible. The statute reads in relevant part:

> The acceptance, before the expiration of the right of redemption and after the commencement of foreclosure proceedings of any mortgage of real property, of anything of value to be applied on or to the mortgage indebtedness by the mortgagee or any person holding under the mortgagee constitutes a waiver of the foreclosure, unless an agreement to the contrary in writing is signed by the person from whom the payment is accepted or, with regard to foreclosures commenced by civil action under section 6321, unless the bank returns the payment to the mortgagor within 10 days of receipt. The receipt of income from the mortgaged premises, by the mortgagee or the mortgagee's assigns while in possession of the premises, does not constitute a waiver of the foreclosure proceedings of the mortgage on such premises.

14 M.R.S.A. § 6204.

The statute says that a mortgagee in possession may accept and apply income from the mortgaged premises without causing a waiver of the foreclosure. It is undisputed that BancBoston held a Collateral Assignment of Leases which was perfected by recordation of the proper indices. *See* Smith Affidavit, p. 3, ¶ 7 and Exhibit D, Collateral Assignment of Lease or Leases. Furthermore, Associates acknowledged it was in default of its obligations to BancBoston under the Note and Mortgage. *See* BancBoston's Memorandum in Support of Summary Judgment, Exhibit A, Complaint, p. 7 ¶ 22, p. 9 ¶ 33. According to the Smith affidavit, on December 24, 1997, counsel for BancBoston sent written notification to Institute's Corporate Clerk informing him that BancBoston exercised its rights under the Assignment of Lease and that all future rental payments should be paid directly to BancBoston. *See* Smith Affidavit, p. 5, ¶ 16. Institute has paid rent to BancBoston and continues to do so post-petition. Based on these facts, I find BancBoston is in possession of the premises and any income received by BancBoston does not constitute a waiver under the statute. *In re Somero*, 122 B.R. 634, 638 (Bankr.D.Me.1991)(holding that under a collateral assignment of rents, "a mortgagee may be entitled to rents and profits upon a default if it either takes possession of the property or has a receiver appointed to collect the rents and profits"); *In re Galvin*, 120 B.R. 767, 771–72 (Bankr.D.Vt.1990)(finding under Vermont law that actual possession of premises unnecessary when mortgagee is in default and bank demands and collects rents directly from the tenant and the tenant pays rents over to the bank); *In re SeSide Co., Ltd.*, 152 B.R. 878 (E.D.Pa.1993) (Under Pennsylvania law possession can be actual possession or constructive possession by making demand for rents on tenants).

■ Additionally, the language of the Collateral Assignment of Lease or Leases states:

> … it is understood and agreed by assignor [Associates] and Assignee [BancBoston] that exercise of any rights by assignee under this agreement, including the receipt of rents, issues and profits and any allocation of same by assignee *shall not constitute a waiver of any rights, statutory or otherwise, of assignee under said mortgage or note including, but not limited to, the right of foreclosure and acceleration of said mortgage indebtedness,* whether such foreclosure or acceleration has been com-

---

12. The Rule states in part:
 When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.
 Fed.R.Civ.P. 56(e).

menced prior to or shall be commenced subsequent to exercise of such rights.

Smith Affidavit, Exhibit D, Collateral Assignment of Lease or Leases ¶ 7 (emphases added). By this language, Associates has waived its right to assert the defense set forth in Section 6204 and has in essence, agreed in writing that such payments do not constitute a waiver as contemplated by the statute.

 Regarding post-petition rents paid by Institute, they were paid pursuant to Court Order and by agreement of all the parties. The Order of April 9, 1998, specifically states that "nothing herein shall limit the rights of...BancBoston...with respect to the lease and/or the pending foreclosure action...." I find that under these circumstances there is no genuine issue of material fact because legally, there has not been a waiver of the foreclosure under the statute.

Finally, Associates argues that there may be a genuine issue of material fact as to the reasonableness of the attorney fees and expenses claimed by BancBoston. Given the breadth of the litigation, I believe that the amount of attorney fees and disbursements sought is presumptively reasonable. However, I do believe Associates is entitled to at least a complete breakdown of the time expended and costs incurred. This issue is not a material issue in the overall litigation and is not decisive in allaying summary judgment in this case.

 Accordingly, because there is no genuine dispute as to any material fact, and BancBoston has established, and it is undisputed that Associates is in payment default under the Note and Mortgage, I GRANT BancBoston's Motion for Summary Judgment and will enter judgment in favor of BancBoston on the Foreclosure Complaint. BancBoston is directed to submit a form of judgment consistent with this decision. The request for attorney fees and disbursements will not be included in the foreclosure judgment at this time and BancBoston is ordered to file a complete detail of its fees and expenses within 10 days, with a copy to Associates. If Associates believes that the fees and expenses are still unreasonable, it must file an objection to those fees and expenses within 15 days with specification of the nature of the objection. The objection must contain admissable evidence sufficient to controvert the reasonableness of the fees. If such an objection is filed, the Court will conduct an evidentiary hearing on that limited issue. The Court will then determine the reasonableness of the fees and costs incurred.

Institute's silence in these proceedings has not gone unnoticed and it appears to be attributable to the fact that BancBoston and Institute are working in concert to maximize the value of the Hospital assets. Pursuant to the Non–Disturbance, Attornment and Subordination Agreement, dated May 11, 1983, if the Institute is not in terminable default under the terms of the Lease, the Lease and the rights of Institute can not be disturbed upon foreclosure and any foreclosure is subject to the Lease. *See* Subordination Agreement at ¶ 2. Through this Chapter 11, Institute can formulate a plan to cure its prepetition defaults and enjoy all of the fruits and benefits under the lease, notwithstanding BancBoston's foreclosure.

### III. *Sanctions:*

 The final issue before the Court is BancBoston's request for Sanctions under Me. R. Civ. P. 11. The parties did not address this motion in oral argument nor has BancBoston supplemented its motion to include the relevant federal provision, Fed. R. Bankr.P. 9011. Additionally, BancBoston has not addressed how the safe harbor provision of the amended Bankruptcy Rule would operate in this proceeding. *See* Fed. R. Bankr.P. 9011(c)(1)(A) [13]. Notwithstanding these shortcomings, I find that while Associates' actions herein have been far from exemplary, the imposition of sanctions is not war-

---

**13.** The safe harbor provision states:

The motion for sanctions may not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, alle-

gation, or denial is not withdrawn or appropriately corrected, except that this limitation shall not apply if the conduct alleged is the filing of a petition in violation of subdivision (b).

Fed. R. Bankr.P. 9011(c)(1)(A).

ranted, at least not at this juncture. In viewing the "big picture", we have a private psychiatric hospital serving an important community need. From this Court's observation, Institute, BancBoston and other interested parties have been cooperating in an attempt to reorganize the facility that was constructed for a single purpose—a psychiatric hospital. The facility's best use is as a psychiatric hospital. Associates is the only party that has been objecting by interposing defenses that have no merit in fact or law. Associates is a "middle man" in these proceedings by virtue of its Sublease with Institute. There is no question in this Court's mind that Associates litigation tactics to date are for the purpose of gaining Associates an unwarranted advantage in negotiating a plan of reorganization. This Court is concerned by the admission made at oral argument by Associates' Counsel Christopher Taintor that he represents both the interests of Cserr and Associates.[14] It is possible that the two interests are divergent and that the actions taken by one may not be in the best interests of the other. Associates is forewarned that all future actions will be closely scrutinized for compliance with Fed. R. Bankr.P. 9011. With that said, the request for sanctions is DENIED without prejudice.

SO ORDERED.

See also 214 B.R. 257.

---

**14.** In responding to this Court's question at oral argument, "Who is Associates," Mr. Taintor responded that he did not know because the question of who is a general partner is disputed and subject to litigation in Massachusetts. Due to the dispute, he stated that he represented Robert Cserr and Associates. Without the answer, the question "Who is Associates" raises an additional question of whether or not Associates has entered a valid appearance in this case and whether or not Associates' purported counsel has authority to act on its behalf.